Filed 11/2/18 (unmodified opn. attached)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H044681 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1519996) |
| v. | ORDER MODIFYING OPINION NO CHANGE IN JUDGMENT |
| FRANCISCO BEDOLLA, | |
| Defendant and Appellant. | |

BY THE COURT:

It is ordered that the opinion filed herein on October 22, 2018, be modified as follows:

1.      On page 1, first sentence of the first paragraph, the phrase "special circumstance" is deleted so the sentence reads:

A jury convicted Francisco Bedolla of attempted first degree burglary and found true the allegation that someone other than an accomplice was in the residence during the commission of the attempted burglary.

2.      On page 1, third sentence of the first paragraph, the phrase "special circumstance" is deleted so the sentence reads:

Bedolla argues on appeal—and the People concede—that the allegation is not applicable to the crime of attempted burglary and must be stricken.

3.      On page 1, fifth sentence of the first paragraph, the phrase "special circumstance" is deleted and the sentence is modified to read as follows:

As explained herein, we shall affirm the judgment, modified to strike the true finding on the allegation that someone other than an accomplice was in the residence during the commission of the attempted burglary.

4.	On page 4, first sentence of the fourth full paragraph, the phrase "special circumstance" is deleted and the sentence is modified to read as follows:

The jury returned a guilty verdict on count 1 and a true finding on the allegation under section 667.5, subdivision (c)(21).

5.	On page 4, second sentence of the sixth full paragraph, the phrase "special circumstance" is deleted and the sentence is modified to read as follows:

He also challenges the section 667.5, subdivision (c)(21) allegation, which the People agree must be stricken.

6.	On page 5, title I., the phrase "**SPECIAL CIRCUMSTANCE**" is deleted and the title is modified to read as follows:

**SECTION 667.5, SUBDIVISION (C)(21) ALLEGATION**

7.	On page 5, second sentence of the first full paragraph, the phrase "special circumstance" is deleted so the sentence reads:

The jury found the allegation to be true.

There is no change in judgment.

Dated: _____	_____
Premo, J.

_____	_____
Greenwood, P.J.	Grover, J.

2

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H044681 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1519996) |
| v. | |
| FRANCISCO BEDOLLA, | |
| Defendant and Appellant. | |

A jury convicted Francisco Bedolla of attempted first degree burglary and found true the special circumstance allegation that someone other than an accomplice was in the residence during the commission of the attempted burglary. Bedolla testified in his own defense. Bedolla argues on appeal—and the People concede—that the special circumstance allegation is not applicable to the crime of attempted burglary and must be stricken. He also contends that the trial court gave conflicting jury instructions on the defense of voluntary intoxication and granted the prosecutor's request to impeach his credibility with inadmissible evidence of a prior offense that did not involve moral turpitude. As explained herein, we shall affirm the judgment, modified to strike the true finding on the special circumstance allegation.

**BACKGROUND**

I. **CHARGES**

The Santa Clara County District Attorney charged Bedolla by information filed on January 11, 2017, with attempted first degree burglary, a felony, committed on

October 31, 2014 (Pen. Code, §§ 664, 459, 460, subd. (a);[1] count 1).  The information also alleged a special circumstance within the meaning of section 667.5, subdivision (c)(21), that a person not an accomplice (A.D.)[2] was present in the residence during the commission of the attempted burglary.

## II.    EVIDENCE AT TRIAL

A.D., who was then 14 years old, rode his bicycle home from school on October 31, 2014, around 12:30 p.m.  He entered the house, locked the door, and went upstairs to his room.  He and his 11-year-old brother were the only people at home.  About 10 minutes later, A.D. heard knocking at the front door.  He ignored it but it became louder so he went downstairs and looked through the front door peephole.  He saw a man, later identified as Bedolla, wearing a white t-shirt.  A.D. did not know the man, so he returned upstairs and looked out the window for a better view.  Another man, wearing a black hoodie, was pacing between the front walkway and the sidewalk.  He appeared to be acting as a lookout.  Meanwhile, the banging on the front door became louder, like kicking.  A.D. heard more than 30 kicks and believed someone was trying to break in.  He called his father who told him to call 911.

A City of San Jose police officer arrived at the scene within 30 to 45 seconds of the emergency call.  Two men were standing in the driveway of A.D.'s house.  They took off running.  The officer intercepted them and detained them at gunpoint.  One suspect, later identified as Joseph Mariscal, was wearing a black jacket with a gray hoodie.  The other, identified as Bedolla, was wearing a white t-shirt.  Officers brought Bedolla and Mariscal to the sidewalk in front of A.D.'s house for an in-field identification.

---

[1] Further unspecified references are to the Penal Code.

[2] We will refer to the witness, who was a minor at the time of the incident and at trial, by his initials.  (Cal. Rules of Court, rule 8.90(b)(4).)

2

A.D. identified them from the upstairs window as the individuals he had seen outside his house.

The front door of A.D.'s house was closed when the officers arrived and was visibly damaged. There was white debris on the door mat and splinters from the door, which was "almost partially open." The damage was consistent with other burglaries in which the front door had been kicked in. Shoe prints on the door matched the shoes worn by Mariscal.

Bedolla testified that he had taken the day off from work to celebrate Halloween with his cousin in San Jose. A coworker drove him in the morning to his cousin's house. The group was drinking and pressured him into joining them. He had beer and about 10 shots, or half a bottle, of cognac. He joined his cousin's neighbor, Mariscal, to meet one of Mariscal's cousins. They were dropped off near the area where they were later arrested. While they waited for the cousin to pick them up, Bedolla knocked on the door of a neighbor's house to trick-or-treat. The neighbor gave him candy.

Bedolla was drunk. He thought he could get more candy. He had seen A.D. ride by on his bicycle and go inside the house. He began knocking on A.D.'s door. He was confused why no one answered so he knocked a few more times. Mariscal was standing on the sidewalk waiting for the cousin to show up. Bedolla was about to give up and walk off when Mariscal came to the door and started kicking it. Mariscal kicked the door about 10 times using the bottom of his shoe. Bedolla eventually tried to pull him away and told him to stop. They were walking away when Bedolla heard a siren. A police vehicle pulled up and the officer confronted them with his gun drawn. Bedolla was compliant and did not run. He did not intend to burglarize the house and was not casing the neighborhood.

Bedolla admitted that in May 2014 he gave a false name to a police officer, and in October 2013, when he was 16 or 17, he committed a felony nontheft-related crime of

3

moral turpitude. He was not so intoxicated on the day of the incident that he did not know what he was doing.

Bedolla's stepfather, Jose Ojeda, testified that he had known Bedolla for six years and had worked with him for the last two years. He believed that Bedolla was honest.

The officer who searched Bedolla did not observe any objective signs of intoxication.

### III. JURY INSTRUCTIONS

The trial court instructed the jury on the charged offense of "attempt[ing] to enter an inhabited dwelling house . . . with the intent to commit theft" under two possible theories of liability: as an aider and abettor and/or as a direct perpetrator. The court instructed the jury on the defense of voluntary intoxication under each of these theories. Neither party objected. We review the pertinent instructions in detail in the Discussion section, *post*.

### IV. VERDICT AND SENTENCING

The jury returned a guilty verdict on count 1 and a true finding on the special circumstance allegation. The trial court sentenced Bedolla on April 28, 2017, to one year in county jail. Based on presentence credits (429 days of credit, consisting of 215 actual plus 214 conduct), the court deemed the jail term served. The court placed Bedolla on three years of formal probation and imposed fines and fees.

Bedolla timely appealed.

### DISCUSSION

Bedolla argues that his conviction for attempted first degree burglary should be reversed because the trial court (1) prejudicially misinstructed the jury on the voluntary intoxication defense and (2) admitted improper impeachment evidence. He also challenges the special circumstance allegation, which the People agree must be stricken.

4

## I. SPECIAL CIRCUMSTANCE ALLEGATION

The information charged Bedolla with attempted first degree burglary and alleged that a person not an accomplice was present in the residence during the commission of the attempted burglary, within the meaning of section 667.5, subdivision (c)(21). The jury found the special circumstance allegation to be true. Bedolla argues the section 667.5, subdivision (c)(21) allegation must be stricken because the evidence at trial showed that neither Bedolla nor Mariscal gained entry to the house. The People agree that section 667.5, subdivision (c)(21) does not apply to attempt crimes and must be stricken.

Section 667.5, subdivision (a) authorizes a sentence enhancement where a prior felony conviction and the new offense are "violent felonies specified in subdivision (c)." Subdivision (c)(21) of that section specifies as one such violent felony "[a]ny burglary of the first degree, as defined in subdivision (a) of Section 460, wherein it is charged and proved that another person, other than an accomplice, was present in the residence during the commission of the burglary." (§ 667.5, subd. (c)(21).) Section 460, subdivision (a) defines "[e]very burglary of an inhabited dwelling house" as burglary of the first degree.

The parties are correct that the allegation was improperly sustained. The plain meaning of section 667.5, subdivision (c)(21) is that a "violent felony" is any first degree burglary where another person, not an accomplice, was present during the burglary's commission. The statute does not refer to attempted burglary, and except as specified, "[s]ection 667.5, subdivision (a), does not apply to attempts to commit the crimes referred to as violent felonies." (*People v. Ibarra* (1982) 134 Cal.App.3d 413, 425.)

As Bedolla points out, the evidence at trial supported only *attempted* first degree burglary, because the kicking of the front door while A.D. was home damaged the door but did not result in entry into the home. (Cf. § 459 ["Every person who *enters* any house . . . with intent to commit grand or petit larceny or any felony is guilty of burglary" (italics added)]; *Magness v. Superior Court* (2012) 54 Cal.4th 270, 279 [reaffirming that

5

for a burglary to have occurred, a part of the body or an instrument must penetrate the outer boundary of the building, in other words "something that is *outside* must go *inside* for an entry to occur"].)  Because there was no entry into the house and Bedolla was convicted of attempted burglary, the true finding on the special circumstance allegation must be stricken.

## II.  VOLUNTARY INTOXICATION INSTRUCTIONS

### A.  Background

Evidence of voluntary intoxication is generally admissible on the issue of whether a defendant formed the specific intent required for the crime charged.  (§ 29.4, subd. (b); *People v. Mendoza* (1998) 18 Cal.4th 1114, 1125 (*Mendoza*).)  In this case, the prosecution advanced two theories by which the jury could convict Bedolla of attempted burglary—either as an aider and abettor of Mariscal or as a direct perpetrator.[3]

To find Bedolla guilty as an aider and abettor, the trial court instructed the jury that the prosecution must prove that Bedolla knew that Mariscal intended to commit burglary and intended to aid and abet Mariscal in committing burglary.  The court then gave the corresponding instruction on voluntary intoxication based on CALCRIM No. 404:  "If you conclude that the defendant was intoxicated at the time of the alleged crime, you may consider this evidence in deciding whether the defendant, A, knew that Joseph Mariscal intended to commit burglary; and, B, intended to aid and abet Joseph Mariscal in committing burglary."[4]

---

[3] The trial court instructed the jury on direct perpetrator and aider and abettor liability using CALCRIM No. 400:  "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime.  I will call that person the perpetrator; two, he or she may have aided and abetted a perpetrator who directly committed the crime.  A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator."

[4] Stated in full, the trial court's instructions on aiding and abetting liability, and the corresponding voluntary intoxication defense, are as follows:
(continued)

Next, the trial court instructed that to find Bedolla guilty of attempted burglary, the prosecution must prove in relevant part that Bedolla "took a direct but ineffective step toward committing burglary" and "intended to commit burglary." The court defined burglary as entry into a building "with the intent to commit theft" and separately defined theft as the taking of property owned by someone else without the owner's consent and with the intent "to deprive the owner of it permanently . . . ." The court again gave a corresponding voluntary intoxication instruction, this time based on CALCRIM No. 3426: "You may consider evidence, if any, of the defendant's voluntary intoxication *only in a limited way*. You may consider that evidence *only in deciding whether the defendant acted with the intent to commit theft*. [¶] . . . [¶] In connection with the charge of attempted burglary, the People have the burden of proving beyond a reasonable doubt that the defendant acted with the intent to commit theft. If the People have not met this burden, you must find the defendant not guilty of attempted burglary." (Italics added.)[5]

---

"[CALCRIM No. 401:] To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: One, the perpetrator committed the crime; two, the defendant knew that the perpetrator intended to commit the crime; three, before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; and four, the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to[,] and does in fact[,] aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. . . . [¶] . . . . [¶]

"[CALCRIM No. 404:] If you conclude that the defendant was intoxicated at the time of the alleged crime, you may consider this evidence in deciding whether the defendant, A, knew that Joseph Mariscal intended to commit burglary; and, B, intended to aid and abet Joseph Mariscal in committing burglary. Someone is intoxicated if he or she took, used, or was given any drug, drink, or other substance that caused an intoxicating effect."

[5] Stated more fully, the trial court's instructions on attempted burglary, and the corresponding voluntary intoxication defense, are as follows:

"[CALCRIM No. 460:] The defendant is charged with attempted burglary. To prove that the defendant is guilty of this crime, the People must prove that: One, the (continued)

7

Outside the presence of the jury and before issuing the jury instructions, the trial court explained that it would give the additional instruction for voluntary intoxication (CALCRIM No. 3426) based on "testimony by defendant he was intoxicated[,] so the jury can consider that." It informed the parties that the court would "include the appropriate intent and the appropriate charge," which it identified as "the intent is to enter the building with the intent to commit theft," noting that there was a separate instruction to define theft. Defense counsel sought clarification but did not object to the proposed instruction.

### B. Contentions

Bedolla contends that the instruction for the jury to consider the intoxication evidence "only in deciding whether the defendant acted with the intent to commit theft" (CALCRIM No. 3426) conflicted with the earlier instruction based on CALCRIM No. 404 and prevented the jury from fully considering his defense, violating his due process rights under the Fourteenth Amendment. He argues that the jury should have considered evidence of intoxication as a defense (1) to the knowledge and intent

---

defendant took a direct but ineffective step toward committing burglary; and, two, the defendant intended to commit burglary. [¶] . . . [¶] . . .

"[CALCRIM No. 1700:] To prove that a defendant is guilty of burglary, the People must prove that the defendant entered a building; and, two, when he entered the building, he intend[ed] to commit theft. [¶] To decide whether the defendant intended to commit theft, please refer to the separate instruction that I will give you on that crime. . . . [¶] . . . [¶]

"[CALCRIM No. 3426:] You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with the intent to commit theft. [¶] A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect or willingly assuming the risk of that effect. [¶] In connection with the charge of attempted burglary, the People have the burden of proving beyond a reasonable doubt that the defendant acted with the intent to commit theft. If the People have not met this burden, you must find the defendant not guilty of attempted burglary."

8

requirements for conviction as an aider and abettor, and (2) as a defense to the mental state for attempted burglary, including intent to enter a building to commit a felony and intent to commit theft—that is, to permanently deprive the owner of his property. Instead, he claims that CALCRIM No. 3426 improperly restricted the jury's consideration of intoxication *only* to a single mental state for attempted burglary. Since the jury returned a general verdict, Bedolla argues that this court has no way of knowing upon which theory of culpability the jury convicted him and whether it applied the proper instructions to reach its conclusion.

The People respond that Bedolla's failure to object to the instruction forfeits the claim on appeal, which in any event fails because the instructions did not conflict and the jury would not have misunderstood them as Bedolla asserts.

### C. Analysis

Bedolla relies on the principle that the appellate court may review "any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby." (§ 1259; see *People v. Anderson* (2007) 152 Cal.App.4th 919, 927 ["Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights."].) He maintains, citing *People v. Hillhouse* (2002) 27 Cal.4th 469, 503 (*Hillhouse*), that a conflict or contradiction in the instructions affects the substantial rights of the defendant and constitutes reversible error.

We are not persuaded that such a contradiction affecting substantial rights occurred here. In *Hillhouse*, the challenged instruction told the jury that motive was not an element of the various crimes charged (murder, robbery, and kidnapping for robbery) and need not be shown. (*Hillhouse*, *supra*, 27 Cal.4th at p. 503.) The defendant argued on appeal that motive *was* an element of those crimes. The Supreme Court reasoned that if the defendant had been correct (though he was not), the instruction "would have contradicted other instructions regarding the elements of the crimes." (*Ibid.*)

9

Because "[i]nstructions regarding the elements of the crime affect the substantial rights of the defendant," no objection was required for appellate review. (*Ibid.*) The court distinguished this type of elemental error from the general premise that "[a] party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial." (*Ibid.*; *People v. Hart* (1999) 20 Cal.4th 546, 622.)

Here, the asserted error is not a contradiction "regarding the elements of the crimes." (*Hillhouse*, *supra*, 27 Cal.4th at p. 503.) The trial court properly instructed the jury on the prosecution's burden to establish guilt as an aider and abettor based on CALCRIM No. 401. Bedolla does not contend that CALCRIM No. 3426 undermined or contradicted CALCRIM No. 401 on the conditions of aider and abettor liability, but rather that it negated the CALCRIM No. 404 instruction regarding the jury's ability to consider intoxication as a *defense* to the mental state required for guilt as an aider and abettor.[6] The defense-specific claim is not analogous to the contradiction in *Hillhouse* concerning motive as a disputed element of the crimes charged.

Bedolla's claim also fails on the merits.

The standard of review for a claim of instructional error is well settled. " 'If a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.' " (*People v. Young* (2005) 34 Cal.4th 1149, 1202 (*Young*).) We determine the correctness of the instructions " 'from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016 (*Castillo*); accord *Young*,

---

[6] Bedolla also does not contend that the court's formulation of CALCRIM No. 3426 was incorrect in law. Though Bedolla complains that CALCRIM No. 3426 should have referenced the intent to commit burglary and to permanently deprive the owner of his property, and not solely the intent to commit theft, it is the asserted contradiction with CALCRIM No. 404 that forms his argument on appeal.

10

*supra*, at p. 1202.)  In doing so, we " ' " 'assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' " ' " (*People v. Guerra* (2006) 37 Cal.4th 1067, 1148, disapproved on another point in *People v. Rundle* (2008) 43 Cal.4th 76, 151, disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Regarding the defense of voluntary intoxication, we "review the instructions as a whole to determine whether it is 'reasonably likely the jury misconstrued the instructions as precluding it from considering' the intoxication evidence in deciding aiding and abetting liability.  [Citation.]  Any error would have the effect of excluding defense evidence and is thus subject to the usual standard for state law error:  'the court must reverse only if it also finds a reasonable probability the error affected the verdict adversely to defendant.' " (*Mendoza*, *supra*, 18 Cal.4th at pp. 1134-1135.)

The California Supreme Court's analysis of similar claims in cases like *Castillo* and *People v. Hughes* (2002) 27 Cal.4th 287 (*Hughes*) helps guide our analysis.

*Castillo* involved a claim that the voluntary intoxication instruction erroneously prevented the jury from considering evidence of intoxication on the question of premeditation.  (*Castillo*, *supra*, 16 Cal.4th at p. 1015.)  The court found that while the jury instruction referred only to "the 'specific intent to kill' . . . without also referring to the mental states of premeditation and deliberation" (*id*. at pp. 1016-1017), the trial court had separately instructed that voluntary intoxication could be considered in determining the mental state required.  (*Id*. at p. 1017.)  Considered as a whole, these instructions were sufficient to avert misunderstanding, because "[n]o reasonable juror would understand the instructions to permit the jury to consider intoxication in determining whether defendant specifically intended to kill but to prohibit it from considering that same intoxication in determining whether he premeditated and deliberated."  (*Ibid*.)

In *Hughes*, the defendant asserted that an erroneous instruction " 'eviscerated' " his voluntary intoxication defense to charges of murder, robbery, and burglary.  (*Hughes*,

11

*supra*, 27 Cal.4th at p. 340.)  The challenged instruction informed the jury in part that
" '*no act committed by a person while in a state of voluntary intoxication is less criminal*' " due to having been intoxicated (*ibid*.), while a different instruction indicated that for the crimes of murder, robbery, and burglary, the jury could consider the defendant's intoxication " '*in determining whether the Defendant had such specific intent and/or mental state*.' " (*Ibid*.)  The defendant argued that a reasonable juror reading these instructions together "would have been confused by this assertedly contradictory information concerning whether or not evidence of voluntary intoxication may serve as a 'defense' to the formation of the specific intent . . . required for murder, robbery, and burglary." (*Id*. at p. 341.)

The *Hughes* court recognized that the first instruction was "potentially misleading" (*Hughes*, *supra*, 27 Cal.4th at p. 341) but found it did not "pose[] a substantial risk of actually misleading the jury into believing that" it was precluded from considering what was the defendant's primary defense at trial.  (*Ibid*.)  The court reasoned that the closing arguments of counsel "emphasized, implicitly and explicitly, the correct interpretation of both instructions . . . ." (*Ibid*.)  The court also observed that given the evidence presented to the jury for its consideration, it was not "reasonably 'likely the jury was "misled to defendant's prejudice" ' or that the jury would have understood [the instruction] to operate in the manner asserted" by the defendant.  (*Ibid*.)

In our case, the theories of liability presented to the jury depended upon distinct mental states.  Guilt as an aider and abettor required the jury to find that Bedolla *knew* that Mariscal intended to commit burglary and *intended* to help him (CALCRIM No. 401), but if the jury concluded that Bedolla was intoxicated at the time of the attempted burglary, it could "consider" that evidence in deciding whether he had the requisite knowledge of Mariscal's purpose and intent to aid and abet him (CALCRIM No. 404).  Guilt as a direct perpetrator required the jury to find that Bedolla *intended* to commit burglary, defined by the court as entry into a building with the *intent* to commit

12

theft (CALCRIM Nos. 460, 1700), and any evidence of Bedolla's voluntary intoxication could be considered "only in a limited way"—that is, "only in deciding whether the defendant acted with the intent to commit theft" (CALCRIM No. 3426). The instruction defined "voluntary intoxication" for the jury and clarified the scope of the limiting language, reiterating that "[i]n connection with the charge of attempted burglary, the People have the burden of proving beyond a reasonable doubt that the defendant acted with the intent to commit theft. If the People have not met this burden, you must find the defendant not guilty of attempted burglary."

Viewing the instructions "as a whole" (*Mendoza*, *supra*, 18 Cal.4th at p. 1134) and with due consideration for the jurors' capability to " ' " 'understand[] and correlat[e]' " ' " them (*People v. Guerra*, *supra*, 37 Cal.4th at p. 1148), we find it is not reasonably likely that the jury would have misconstrued CALCRIM No. 3426 as Bedolla contends. The direction to consider evidence of voluntary intoxication "only in a limited way" and "only in deciding whether the defendant acted with the intent to commit theft" was set amid the instructions on the direct perpetrator theory of guilt. A CALCRIM No. 200 instruction emphasized the jury's mandate to "[p]ay careful attention to all of these instructions and consider them together" and to apply the "ordinary[,] everyday meanings" to words and phrases not specifically defined in the instructions. It is evident from the final sentence of CALCRIM No. 3426 that the direction for the jury to apply any intoxication evidence only to the "intent to commit theft" was "[i]n connection with the charge of attempted burglary" as a direct perpetrator. A contrary understanding would have required the jury to disregard both the " 'entire charge of the court' " (*Castillo*, *supra*, 16 Cal.4th at p. 1016) and the context for the limiting language in CALCRIM No. 3426.

Just as "[n]o reasonable juror" in *Castillo* would have understood instructions to permit the consideration of intoxication in deciding one type of mental state but not another (*Castillo*, *supra*, 16 Cal.4th at pp. 1016-1017), we find it would strain credulity

13

for the jury in this case to have interpreted CALCRIM No. 3426 as negating a clear instruction on an altogether different theory of liability.

The fact that there was a commonsense, noncontradictory way to read the instructions distinguishes this case from others cited by Bedolla. (See, e.g., *People v. Lewelling* (2017) 16 Cal.App.5th 276, 296-299 [inaccurate instructions grossly misled jury about the definition of a key element in the case, leading to multiple questions from jurors]; *LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, 872 [instruction entirely not supported in evidence may have misled jury].)

Here, the prosecutor's closing argument also reinforced a correct understanding of the instructions by stating that if the jurors could not find Bedolla guilty of the attempted burglary as a direct perpetrator, they should "proceed to a new series in the jury instructions, and those are the aiding and abetting instructions, and that instruction starts off at number 400 in the list that you'll be provided in the jury room." (*Young*, *supra*, 34 Cal.4th at p. 1202 [appellate court "must consider the arguments of counsel in assessing the probable impact of the instruction on the jury"].) This argument highlighted the jury's ability to separately consider Bedolla's knowledge and intent to aid and abet, and diminished any possibility of confusion about the applicability of CALCRIM No. 404 by referring the jury to the "number 400" set of instructions. (*People v. Garceau* (1993) 6 Cal.4th 140, 189 [parties' closing arguments diminished any possibility of confusion about conspiracy instruction], disapproved on another point in *People v. Yeoman* (2003) 31 Cal.4th 93, 117-118.)

At the same time, defense counsel's closing argument made only one reference to the evidence of Bedolla's intoxication (which was notably contradicted by the police officer's testimony) and made no reference to the intoxication instructions.[7] The fact that

_____

[7] After suggesting that the evidence could support a vandalism, rather than attempted burglary, and reminding the jury that it must adopt the innocent explanation, a
(continued)

14

Bedolla's defense at trial did not actually rely on the intoxication defense reduced the likelihood that any purported conflict between the intoxication instructions "posed a substantial risk of actually misleading the jury . . . ." (*Hughes*, *supra*, 27 Cal.4th at p. 341.)

Like in *Hughes*, the combined effect of the jury instructions, explicit and implicit arguments of counsel, and nature of the evidence itself, supports our conclusion that it was not reasonably likely that the jury misunderstood or misapplied the challenged instructions to the defendant's prejudice. (*Hughes*, *supra*, 27 Cal.4th at p. 341; see *Mendoza*, *supra*, 18 Cal.4th at pp. 1134-1135 [defining prejudice based on the erroneous exclusion of defense evidence as requiring " 'a reasonable probability the error affected the verdict adversely to defendant' "].) Accordingly, we find no reversible error and need not address Bedolla's constitutional claims.

### III. IMPEACHMENT FOR CARRYING A LOADED FIREARM IN PUBLIC

Bedolla challenges the admission of impeachment evidence based upon a prior juvenile adjudication, which the trial court sanitized to refer to a "felony nontheft-related crime of moral turpitude." He contends that the underlying offense was not a crime of moral turpitude, and the references to "moral turpitude" and "nontheft-related" invited the jurors to speculate about the nature of the offense and Bedolla's character. According to Bedolla, the admission of this impeachment evidence violated his due process rights by permitting the jury to consider improper evidence.

---

"lack of intent" if evidence "points both ways," defense counsel stated, "What about intoxication? There's a few things I wanted to bring up all at once. The intoxication of my client. The officers test about it—testified about it." This isolated reference to intoxication was not likely to be persuasive, given that the officer testified that Bedolla showed no objective signs of intoxication, and Bedolla himself testified that he "knew what [he] was doing" and knew right and wrong after he had been drinking.

15

## A. Procedural Background

The prosecutor moved in limine to impeach Bedolla with a prior misdemeanor conviction from 2014 for providing false identification to a peace officer (§ 148.9, subd. (a)) and with a juvenile adjudication from 2013 for carrying a loaded firearm while in a public place (§ 25850, subd. (a)). The trial court granted the motion as to the false identification conviction because it was a crime of moral turpitude appropriate for impeachment if Bedolla were to testify.

As for the juvenile adjudication, the court initially denied the motion under Evidence Code section 352. It recognized that whether the firearm offense qualified as a crime of moral turpitude was an open question, finding some support in cases that held similar crimes involving concealed weapons to be crimes of moral turpitude. But the court was concerned about potential prejudice. It observed that while the juvenile adjudication "is suggestive certainly of a crime of moral turpitude because of a readiness to do evil, there are some prejudice issues that the Court needs to consider when you're talking about the defendant potentially having a weapon in a case where there is no weapon charged, that the jury could use that for an improper purpose in this case." Since the prosecution would be able to impeach Bedolla with his prior conviction for providing false identification, the court found the "[a]dditional marginal relevance for further impeachment . . . outweighed in this case by the potential prejudice or undue consumption of time, confusion of issues to the jury, particularly in a case where it's not one clearly found under the law to be a crime of moral turpitude."

The prosecutor then suggested that the court allow a sanitized reference to the offense as a crime of moral turpitude but without mention of a weapon. The court agreed that sanitizing the evidence would avoid the risk of prejudice. Defense counsel objected that such "generalized wording" might encourage the jury to speculate in other ways about the nature of the underlying offense, including the possibility that it "could be anything from child molest to arson to theft." After further discussion with counsel, the

16

court proposed calling the prior offense a "nontheft-related crime of moral turpitude . . . ." Both sides agreed.[8]

Defense counsel elicited testimony during Bedolla's direct examination that in 2013, when he was 16 or 17, he admitted to a felony nontheft-related crime, and in 2014 he gave a false name to a police officer. The prosecutor cross-examined Bedolla about the false identification offense, asking several times whether he had lied to a police officer "to avoid accepting responsibility for something you'd done wrong; right?" When Bedolla continued to deny lying to avoid responsibility, the prosecutor asked whether he also had committed a felony nontheft-related crime of moral turpitude, which Bedolla admitted.

## B. The Offense Involves Moral Turpitude

"Past criminal conduct involving moral turpitude that has some logical bearing on the veracity of a witness in a criminal proceeding is admissible to impeach, subject to the court's discretion under Evidence Code section 352." (*People v. Harris* (2005) 37 Cal.4th 310, 337 (*Harris*).) This includes prior misconduct that was the subject of a juvenile adjudication. (*People v. Lee* (1994) 28 Cal.App.4th 1724, 1740.)

We are aware of no published case deciding if carrying a loaded firearm on the person or in a vehicle while in a public place, in violation of section 25850, subdivision (a), is a crime of moral turpitude. We consider this question and, relatedly, whether the violation has "some logical bearing on" veracity (*Harris*, *supra*, 37 Cal.4th at p. 337).

---

[8] It appears from the record that Bedolla may have waived any argument concerning the admissibility of this impeachment evidence by consenting to the sanitized version. However, absent any indication by the parties that the issue is forfeit on appeal and given defense counsel's protestations about the sanitized evidence inviting improper speculation, we will address Bedolla's arguments on the merits.

*People v. Aguilar* (2016) 245 Cal.App.4th 1010 (*Aguilar*) provides the relevant framework for our review. "Whether a particular conviction involves moral turpitude is a question of law for the court to resolve. (*People v. Collins* (1986) 42 Cal.3d 378, 390.) In making that determination, courts follow the 'least adjudicated elements' test set forth in [*People v. Castro* (1985) 38 Cal.3d 301, 317]. 'The "least adjudicated elements" test means that "from the elements of the offense alone—without regard to the facts of the particular violation—one can reasonably infer the presence of moral turpitude." [Citations.]' [Citation.] 'Crimes involve moral turpitude when they reveal dishonesty, a " 'general readiness to do evil,' " ' (*People v. Gabriel* (2012) 206 Cal.App.4th 450, 456), or 'moral laxity of some kind' (*People v. Garrett* (1987) 195 Cal.App.3d 795, 798 (*Garrett*))." (*Aguilar*, *supra*, at p. 1017.)

*Aguilar* addressed the admissibility of impeachment evidence based on a prior felony conviction for carrying a concealed firearm in a vehicle in violation of section 25400, subdivision (a). (*Aguilar*, *supra*, 245 Cal.App.4th at p. 1011.) The court rejected the defendant's argument that the offense did not involve moral turpitude because it required no affirmative act signifying " ' "a readiness to do evil." ' " (*Id.* at p. 1017.) It explained that crimes involving firearms pose a "recognized risk of violence." (*Ibid.*) Neither an intent to injure nor an intent to personally arm oneself are necessary elements for a finding of moral turpitude (*id.* at pp. 1018-1019) because "[a] defendant who intentionally carries a concealed firearm in a vehicle 'which permits him immediate access to the firearm but impedes others from detecting its presence, poses an "imminent threat to public safety." ' " (*Id.* at p. 1019.)

Bedolla posits that *Aguilar* is distinguishable because it features a *concealed* weapons offense. It is the element of concealment, according to Bedolla, that drives the moral turpitude analysis in *Aguilar*. To emphasize the distinction between concealment and possession, Bedolla cites *In re Charles G.* (2017) 14 Cal.App.5th 945 (*Charles G.*). In that case, the court held that a minor can be convicted of both possessing a firearm that

18

is capable of being concealed (§ 29610) and of carrying and concealing a firearm (§ 25400, subd. (a)(2)), because the offenses address different conduct and serve different purposes. (*Charles G.*, *supra*, at pp. 951-952.) Bedolla also argues in further distinction that while concealing a firearm implies dishonesty, carrying or possessing a firearm carries no such significance. (See *People v. Bell* (1984) 159 Cal.App.3d 323 [concluding that a prior conviction for possession of a concealable firearm by a felon had little bearing on veracity and was properly excluded].)

We are not persuaded that carrying a loaded firearm in a public place carries any less taint of moral turpitude than concealing a firearm—loaded or not—on one's person or in a vehicle. Bedolla's effort to distinguish the offense at issue from one involving concealment does not answer whether a violation of section 25850, subdivision (a) " 'reveal[s] dishonesty, a " 'general readiness to do evil,' " ' . . . or 'moral laxity of some kind.' " (*Aguilar*, *supra*, 245 Cal.App.4th at p. 1017, citations omitted.)

Under section 25850, subdivision (a), it is a crime for a person to "carry[] a loaded firearm . . . on the person or in a vehicle while in any public place . . . ." The facts of Bedolla's prior violation of this section are not relevant to the moral turpitude analysis, since the " 'least adjudicated elements' " test requires the court to derive its conclusion " ' "from the elements of the offense alone . . . ." ' " (*Aguilar*, *supra*, 245 Cal.App.4th at p. 1017.) These elements, as set forth in the pattern instruction for section 25850, subdivision (a), are (1) the defendant carried a loaded firearm on his person or in a vehicle, (2) the defendant knew he was carrying a firearm, and (3) the defendant was in a public place or on a public street in an incorporated city or in an unincorporated area where it is unlawful to discharge a firearm. (CALCRIM No. 2530.)

We agree with Bedolla that carrying a loaded firearm in public does not imply dishonesty in the manner of concealment. But "moral turpitude does not depend on dishonesty being an element of the felony." (*People v. Mansfield* (1988) 200 Cal.App.3d 82, 87, citing *People v. Castro*, *supra*, 38 Cal.3d at p. 315 (*Castro*).) What matters is the

19

fact that carrying a loaded firearm in a public place enables violence to erupt, possibly without warning, and thus suggests a " ' " 'general readiness to do evil,' " '. . . or 'moral laxity of some kind' . . . ." (*Aguilar*, *supra*, 245 Cal.App.4th at p. 1017, citations omitted.)  Given the risk of harm that a person who knowingly[9] carries a loaded firearm on their person or in a vehicle presents to the nearby public, we find the analysis in *Aguilar* applies with equal force here.  As *Charles G.* recognized, the purpose of a prohibition against carrying a loaded firearm in public is " 'the hazard arising when any person carries a loaded firearm in public. . . .  [T]he mere fact the weapon is loaded is hazardous, irrespective of the person (except those persons specifically exempted) carrying it.' " (*Charles G.*, *supra*, 14 Cal.App.5th at p. 953, quoting *People v. Harrison* (1969) 1 Cal.App.3d 115, 122, disapproved on other grounds in *People v. Jones* (2012) 54 Cal.4th 350, 360.)

We believe that this reading of the potential risk to the public addressed by section 25850, subdivision (a) is consistent with our high court's analysis in *People v. Wade* (2016) 63 Cal.4th 137 (*Wade*).  Although *Wade* did not assess the use of a prior conviction under section 25850, subdivision (a) for impeachment, it did find that "the statute should be fairly applied consistent with the Legislature's concern with the *threat to public safety* from those with control over and *ready access to loaded guns in public*." (*Wade*, *supra*, at pp. 143-144, italics added.)  This recognition of the danger to the public may be traced to the statement of the Legislature explaining the enactment of the original prohibition against carrying a loaded firearm (codified at former section 12031,

---

[9] We agree with the analysis of a related statute by the court in *People v. Gonzales* (2015) 232 Cal.App.4th 1449, 1463, holding that criminal statutes that lack an express knowledge requirement nevertheless generally require knowledge of the facts that make the conduct illegal.  In our case, this interpretation is consistent with the pattern jury instruction for a violation of section 25850, subdivision (a).
(continued)

20

subdivision (a)(1)).[10]  The Legislature declared the statute necessary to address

" 'the increasing incidence of organized groups and individuals *publicly* arming

themselves for purposes inimical to the peace and safety of the people of California' "

and to help " 'protect the people of this state from either the use of such weapons or from

violent incidents arising from the *mere presence of such armed individuals in public*

*places*.' . . ."  (*Wade*, *supra*, at p. 143, quoting Stats. 1967, ch. 960, § 6, pp. 2462-2463,

italics added.)

Against this backdrop, it is not difficult to conclude that the risks attached to the

conduct prohibited by section 25850, subdivision (a) demonstrate a " 'general readiness

to do evil' " that satisfies the moral turpitude analysis.  What is less clear is why this also

satisfies the relevancy requirement for use for impeachment.  (See Evid. Code, § 210

[defining evidence relevant to witness credibility as "having any tendency in reason to

prove or disprove" a disputed fact that is of consequence to the action].)

Our high court in *Castro* answered that question by revisiting the "precise

progression of inferences" (*Castro*, *supra*, 38 Cal.3d at p. 314) that justifies using a prior

conviction involving moral turpitude to impeach a witness' credibility.  It recited

reasoning offered by Justice Holmes over a century ago:  " '[W]hen it is proved that a

witness has been convicted of crime, the only ground for disbelieving him which such

proof affords is the *general readiness to do evil* which the conviction may be supposed to

show.  It is from that general disposition alone that the jury is asked to infer a readiness to

lie in a particular case, and thence that he has lied in fact.' "  (*Ibid*.)  Thus, according to

---

[10] " 'Section 25850, subdivision (a), is the successor statute to former
section 12031, subdivision (a)(1), which was repealed in 2010 as part of the Deadly
Weapons Recodification Act of 2010 (the Act).  (§ 16000 et seq.)' "  (*Wade*, *supra*, 63
Cal.4th at p. 140.)  As the court explained, the Deadly Weapons Recodification Act did
not " 'substantially change the law relating to deadly weapons and "[wa]s intended to be
entirely nonsubstantive in effect."  (§ 16005.)' "  (*Ibid*.)

21

*Castro*, if the crime "does not show a 'readiness to do evil,' the fact of conviction simply will not support an inference of readiness to lie." (*Ibid.*)

The court in *Castro* further acknowledged that it is more difficult to infer that a witness is lying when, as here, the prior conviction does not involve "dishonesty as a necessary element" and "merely indicates a 'bad character' and 'general readiness to do evil.'" (*Castro*, *supra*, 38 Cal.3d at p. 315.) Still, it called it "undeniable that a witness' moral depravity of any kind has some 'tendency in reason' (Evid. Code, § 210) to shake one's confidence in his honesty." (*Ibid.*) The court thus concluded that there is "some basis—however tenuous—for inferring that a person who has committed a crime which involves moral turpitude other than dishonesty is more likely to be dishonest than a witness about whom no such thing is known." (*Ibid.*) It cautioned, however, that "the more tenuous . . . the connection between the moral defect shown by the conviction and the only defect directly relevant—dishonesty—the more likely" that the court will disallow its use for impeachment. (*Id*. at p. 316.)

Subsequent decisions of the California Supreme Court have reinforced the linkage between moral turpitude and California's standard of relevance for impeachment evidence. As stated in *People v. Wheeler* (1992) 4 Cal.4th 284, 296, "the admissibility of any past misconduct for impeachment is limited at the outset by the relevance requirement of moral turpitude." For this reason, a prior criminal conviction involving moral turpitude will be considered at least minimally relevant to the witness' credibility. (*People v. Collins*, *supra*, 42 Cal.3d at p. 389 [a conviction is inadmissible under *Castro* if it does not necessarily involve moral turpitude].) In *People v. Robinson* (2005) 37 Cal.4th 592, the court reaffirmed the connection between moral turpitude and relevance for impeachment by stating that the misdemeanor convictions "reflected a crime of moral turpitude *and therefore were relevant to the witnesses' honesty and veracity*." (*Id*. at p. 626, italics added; see also *Wheeler*, *supra*, 4 Cal.4th at p. 295 ["[m]isconduct involving moral turpitude may suggest a willingness to lie . . . ."].)

22

California's appellate courts have applied this logic to uphold the admissibility of prior criminal conduct for impeachment, hinged *not* on a finding that the prior offense involves dishonesty but on a finding that it threatens serious harm to the public and so implicates a " ' "general readiness to do evil" ' " constituting moral turpitude. (See, e.g., *People v. Gabriel*, *supra*, 206 Cal.App.4th at p. 458 [possession of illegal assault weapon may "cause greater harm to the public than general firearms"]; *People v. Rivera* (2003) 107 Cal.App.4th 1374, 1382 [possession of deadly weapon with intent to commit an assault "represents a degree of public harm significantly greater than simple assault or simple drug possession" and exhibits conduct indicating " ' "general readiness to do evil" ' "]; *Aguilar*, *supra*, 245 Cal.App.4th at p. 1018 [carrying a concealed firearm " 'presents a recognized "threat to public order" ' "]; *People v. Robinson* (2011) 199 Cal.App.4th 707, 714-715 [felon in possession of a firearm presents a danger to public welfare because felons are more likely to use guns for improper purposes].)

In sum, the determination that a prior criminal act is a crime of moral turpitude is tantamount to finding that it may be used for impeachment, subject as always to the trial court's discretion to exclude the evidence under Evidence Code section 352. Insofar as the state legislature has determined that the crime of carrying a loaded firearm in a public poses a grave risk of harm, we conclude that Bedolla's prior juvenile adjudication involves moral turpitude. Under *Castro*, that is sufficient to make it relevant to his credibility as a witness. (*Castro*, *supra*, 38 Cal.3d at p. 306 [California "authorizes the use of any . . . conviction which necessarily involves moral turpitude, even if the immoral trait is one other than dishonesty"].) Accordingly, we hold that a prior violation of section 25850, subdivision (a) is admissible to impeach, subject to the court's discretion under Evidence Code section 352.

## C. The Trial Court Did Not Abuse its Discretion in Admitting the Sanitized Impeachment Evidence

The trial court has broad discretion in determining the admissibility of evidence. (*Harris*, *supra*, 37 Cal.4th at p. 337.) "A trial court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless the trial court 'exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 705 (*Ledesma*).) The erroneous admission of evidence to impeach a witness' credibility is harmless if after a review of the entire record demonstrates "it is not reasonably probable that a result more favorable to defendant would have occurred in the absence of error." (*Castro*, *supra*, 38 Cal.3d at p. 319.)

The trial court in this case cited several reasons for initially deciding to exclude the evidence of Bedolla's prior juvenile adjudication. Primary among these was the risk of prejudice to Bedolla that could have arisen from the jury's knowledge that the prior offense involved a weapon. The court admitted the prior adjudication for impeachment only after the parties agreed to remove any reference to a firearm and to specify the offense was nontheft-related, in response to defense counsel's concern that the jury might speculate about the nature of the prior offense.

Bedolla argues that the terminology "felony nontheft-related crime of moral turpitude" was highly suggestive and invited the jurors to speculate about the nature of his "moral turpitude." He contends that but for the trial court's admission of the "sanitized" yet "loaded" reference to a prior felony, the jury might have dismissed Bedolla's impeachment with the section 148.9 false identification offense as an isolated incident of youthful indiscretion.

We find no abuse of discretion. Bedolla's credibility was at issue because the nature of his defense was to deny any knowledge of or intent to commit a burglary. This increased the relevance of Bedolla's having admitted to a crime involving moral turpitude

24

only a few years earlier. (*Aguilar*, *supra*, 245 Cal.App.4th at p. 1020 [holding it was precisely because "the case was essentially a 'he said-she said' credibility contest" that the defendant's prior conviction of a crime of moral turpitude was highly relevant].) The trial court balanced the relevant factors in weighing the probative value of the evidence for impeachment against the danger of undue prejudice due to the nature of the weapon-related prior offense. (Evid. Code, § 352.) Under those facts, admitting the sanitized version of the evidence was not unreasonable, let alone arbitrary or capricious. (*Ledesma*, *supra*, 39 Cal.4th at p. 705.)

Even if error did occur, we find the prejudice to Bedolla was minimal or nonexistent. The jury instruction that jurors may consider the fact that a witness has committed a crime or other misconduct "only in evaluating the credibility of the witness' testimony" mitigated the likelihood of improper speculation about the nature of the unspecified crime of moral turpitude. Also, the prosecutor attacked Bedolla's credibility from several angles at trial but devoted only a single question to confirm Bedolla's admission to the felony nontheft-related crime of moral turpitude. In closing argument, the prosecutor never referenced the prior juvenile adjudication, instead emphasizing other vulnerabilities in Bedolla's testimony such as his "unique vantage point" getting to see all the evidence and "fill in any gaps," that he "changed his story many times," that his testimony was uncorroborated, and that he "also admitted lying to a police officer a few months before committing this crime . . . ."

Given the range of credibility challenges that Bedolla suffered and the scant attention paid by both sides to his prior juvenile adjudication, we find it highly unlikely "that a result more favorable to defendant would have occurred" (*Castro*, *supra*, 38 Cal.3d at p. 319) if the trial court had excluded the sanitized reference to Bedolla's prior violation of section 25850, subdivision (a).

25

**DISPOSITION**

The judgment is modified to strike the true finding on Penal Code section 667.5, subdivision (c)(21) allegation.  As so modified, the judgment is affirmed.

_____
                          Premo, J.

WE CONCUR:




_____
           Greenwood, P.J.




_____
           Grover, J.




<u>People v. Bedolla</u>
H044681

| Trial Court: | Santa Clara County Superior Court<br>Superior Court No. C1519996 |
|---|---|
| Trial Judge: | Hon. Julia Alloggiamento |
| Counsel for Plaintiff/Respondent:<br>The People | Xavier Becerra<br>Attorney General<br><br>Gerald A. Engler<br>Chief Assistant Attorney General<br><br>Jeffrey M. Laurence<br>Senior Assistant Attorney General<br><br>Eric D. Share<br>Supervising Deputy Attorney General<br><br>Melissa A. Meth<br>Deputy Attorney General |
| Counsel for Defendant/Appellant:<br>Francisco Bedolla | Under appointment by the Court of<br>Appeal<br>Nancy Susan Brandt |

People v. Bedolla
H044681