Filed 9/9/20  P. v. Moore CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B299694 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA474130) |
| v. | |
| ROSCOE CLARK MOORE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig E. Veals, Judge.  Affirmed.

Christopher Muller, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and Rama R. Maline, Deputy Attorney General, for Plaintiff and Respondent.

————————————

Roscoe Clark Moore challenges his conviction for attempted burglary, saying the prosecutor improperly asked jurors to sympathize with the elderly victim.  We hold that Moore forfeited this point and, even if he did not, that any error was harmless.  In addition, Moore and the prosecution correctly agree we should strike the jury's "person present" finding pursuant to Penal Code section 667.5, subdivision (c)(21).  We strike this finding and otherwise affirm.  Statutory references are to the Penal Code.

I

Amanda Dixon lived on the ground floor of a small apartment complex.  Her niece, Nedrea Morgan, lived on the second floor.  Dixon's sister—Morgan's mother—also lived on the second floor, in her own apartment.

Morgan had dated Moore off and on for several years.  Moore got to know both Dixon and the small apartment complex where she, Morgan, and Morgan's mother lived.  While dating Morgan, Moore sometimes spent the night in Morgan's second floor apartment and sometimes also got mail there.

Their dating relationship ended in 2012 or 2013.  Afterwards, Moore stayed in touch with Morgan to a degree.

On January 6, 2019, around 7:00 a.m, Dixon was in her ground floor apartment getting ready for church.  She heard someone moving garbage cans outside her apartment and went to her back entrance, which opens onto an alley.  This back entrance had an inner wooden door and an outer metal security door.  Dixon opened the inner door and saw Moore outside, lying on the back steps working a crowbar on the outer door.  Dixon was not wearing her glasses and did not recognize Moore.  He may have had motor oil on his face and hands.

Dixon was scared and asked Moore what he was doing.

Moore replied: "I know your niece. I'm a friend of your niece." He said he knew Dixon, thought she was dead, and thought her family was in New Jersey for her funeral. He told Dixon he had caused the noise with the trash cans while looking for an open window.

Morgan and her mother heard a commotion and went downstairs and out the back door of the building. As they approached the back door, Moore dropped the crowbar and ran.

Morgan and her mother did not see anyone in the backyard. A parked car was there, as it had been the night before, but now its door was open, its hood was up, and the front driver-side window was broken.

Dixon's metal security door was damaged at the top, hinges, and lock. Part of its door frame was missing.

Police came swiftly, arriving at about 7:20 a.m. They found Moore behind a closed gate in the backyard.

Moore was carrying gloves.

A police body camera recorded Moore's interaction with the officers. We italicize parts of the conversation:

Officer 1: How you doing?

Moore: Not bad and you?

Officer 1: I'm good, do you live here?

Moore: I used to.

Officer 1: When did you live here?

Moore: Uh . . . it's been like 3 years, 4 years.

Officer 1: *So what was going on earlier over here?*

Moore: *I don't know, you have to ask them.*

Officer 1: *So why were you trying to go inside the house?*

Moore: *Because I thought she wanted me to pick something up.*

Officer 1:  You thought she wanted you to pick something up?

Moore:  Yeah.

. . . .

Officer 1:  Okay, is there a way you can hop the gate and come back over here so we can talk?

Moore:  Yeah, I'm gonna come right now, I'm not gonna hop the gate, but Imma walk around.  Or you can tell her to come out here and give you the key?

Officer 1:  Oh she has a key?

Moore:  Yeah.  Imma wait right here, I'm not going nowhere.  You want to cuff me to the thing?

Officer 1:  Nah, nah, nah, what's your name?

Moore:  Roscoe Moore.

. . . .

Officer 1:  Were you sleeping in that car back there too?  No?  *What did you use to try to get inside the house?*

Moore:  *Uh . . . a—a crowbar.*  I lost the keys.

Officer 1:  Oh, so you used to live there?

Moore:  Yeah.

. . . .

Moore:  *She left me a note*, I thought she left out of town and left something for me.

Officer 1:  What's her name?

Moore:  Nedrea Morgan.

Officer 1:  Is that it?

Officer 2:  The . . . who's Nedrea Morgan?

Moore:  The lady that lives upstairs.

The officers found pry marks on Dixon's back door and a crowbar at the scene.

4

An information charged Moore with attempted first degree residential burglary in violation of sections 664 and 459 (count 1) and burglary in violation of section 459 (count 2).

At trial, Morgan testified she had not seen Moore for about a year before the incident. After they stopped dating in 2012 or 2013, Moore would call her "[e]very once in a blue moon." She last spoke to him about a month earlier, when they talked for a minute over the phone. She did not write a note to Moore to come pick up anything, nor did she ask him to come over. She did not give Moore permission to enter the building. She did not hear anyone knock on the door that morning.

There was no evidence a note ever existed.

Dixon had nothing of Moore's in her apartment.

The court instructed the jury it must not be influenced "by pity for or prejudice against the defendant" or "by mere sentiment, conjecture, sympathy, passion, [or] prejudice . . . ."

It instructed, "Statements made by the attorneys during the trial are not evidence."

The court also instructed that, to prove the crime of burglary, the prosecution had to prove Moore "entered" a building with the intent to steal and take away "someone else's property," intending to deprive the owner permanently of that property.

During closing argument, the prosecutor said this:

"Power points and legal jargon aside, on the morning of the crime, Ms. Dixon was in her safe place. She was in her home. She was waking up and getting ready to go to church, and the defendant crushed that sense of security. He took advantage of an 86 year old woman. He took advantage of his knowledge of that property and that premises. He knew his way around. What is easier than that? He knew that she was 86 years old,

5

that she lived alone, and she was on that bottom floor.  Who was more vulnerable than that?  Who was an easier target for the defendant's burglary than that?

"He grabbed his gloves, and he grabbed his crowbar, and he went into the backyard, not the front.  He broke the window of the car before moving on to find a secluded point of entry.  First the windows, then the door.  He took advantage of an 86 year old woman, and I'm going to ask you to use your common sense.  There's only one reasonable interpretation of the facts that you heard yesterday.  I'm going to ask you to hold the defendant responsible for his actions, to find him guilty of first degree residential burglary with Ms. Amanda Dixon present.  Thank you."

Moore's counsel did not object to this statement.  Rather he seized upon and sought to generalize the concept of fairness.  Moore's counsel, named Mr. Schneider, argued to the jury.  The italics are ours.

"Now you're thinking, well, you know, Mr. Schneider, you know, look what happened to this lady.  She's 87 years old.  She was so nice, so sweet.  She had her door damaged.  She was scared half to death.  I mean how -- how can -- how can we let this go?  How can we let this go?  How can the law be such?

"Well, look, what happened to her was not fair at all.  I'll be the first to admit it's not fair at all.  And what Mr. Moore did that day, he's definitely guilty of some crimes, trespass, vandalism of the door, attempted breaking and entering.  All of those can be felonies.  But he's not charged with those crimes here.  The District Attorney's Office chose to charge him with one of the most serious crimes they could, which is a specific intent crime.

"Trespass, vandalism, attempted breaking and entering, those aren't specific intent crimes. You just have to be on someone's property. You just have to do the bad act. You just have to break something. Right? They chose to charge him with one of the most serious crimes that they could. In my opinion I believe it's overcharged. They can't prove the specific intent here. *And just like it's not fair what happened to Ms. Dixon, it's not fair at all -- it's also not fair to convict Mr. Moore of something that he didn't do, of a crime that the People can't prove beyond a reasonable doubt.*"

Moore's counsel thus argued the jury should not convict Moore of burglary because Moore had an actual belief he was entering to retrieve his own property, which negated the prosecution's theory that, beyond a reasonable doubt, Moore was entering with the intent to steal someone else's property.

The second defense theory was Moore had not "entered" Dixon's building. Counsel argued Moore never got to the inner wooden door, and that attempting to pry open the outer metal security door was not "entering." "You have to penetrate inside the building," counsel argued, and he said Moore never did.

The jury accepted this second line of defense, rejected the charge of burglary, and convicted Moore only of *attempted* burglary. The jury also found a person who was not an accomplice was present on the premises during the commission of the crime. (§ 667.5, subd. (c)(21).)

The court sentenced Moore to the upper term of three years on count 1, awarded 326 days of presentence custody credit, and ordered him to pay fines and fees. It did not enhance Moore's sentence based on the jury's "person present" finding.

Moore appeals, contending the prosecutor committed reversible misconduct by improperly appealing to sympathy for the victim in the closing argument, as we have excerpted.

II

Moore forfeited his complaint by failing to object at trial. Making a timely and specific objection at trial, and a request the jury be admonished, are necessary prerequisites to preserve a claim of prosecutorial misconduct for appeal. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 (*Seumanu*).)

Powerful logic propels this requirement of a timely and specific objection.

An objection alerts the trial court to someone's perception of a problem and allows for instant evaluation, in the full context of the atmosphere in the room at that moment. Objections and requests for admonitions likewise enable a court to administer a swift remedy: a curative instruction to the jury, targeted, on the spot, and without delay.

A lot goes on during closing argument that never appears in a transcript. Counsel and court are keenly attuned to cues from jurors. Are they bored? Riveted? Rolling their eyes? Nodding in agreement, or looking away and squirming in discomfort? Which arguments are resonating and which are belly flops?

An astute attorney calculates second-by-second and sentence-by-sentence about whether to object. A decision to avoid objecting often is a tactical judgment based on factors the transcript never records. Then the moment passes, and the visual cues are gone forever. An appellate court can never recapture the full tenor of the moment.

8

It thus can be unfair as well as inefficient to allow a party to make a strategic call, to refrain from objecting, to see how the jury decides, and then—if one dislikes the result—to complain only on appeal.

Moore's lack of objection here had a tactical aspect. As soon as the prosecutor finished, Moore's counsel took the prosecutor's theme of Dixon's age and vulnerability and tried to turn it to defense advantage. Moore's actions and words meant his attorney had to select from an inventory of unattractive options. We do not second-guess this attorney's decisionmaking at this stressful moment in the arena. But counsel's decision carried with it the consequence of forfeiture.

Nothing suggests that, if Moore had objected during trial, his objections would have been futile, or that an admonition would have failed to cure some alleged harm. (See *People v. Hill* (1998) 17 Cal.4th 800, 820.)

### III

Under any standard of review, the overwhelming evidence of Moore's guilt means any misconduct by the prosecutor was harmless. (See *Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

We will assume, strictly for purposes of analysis, there was error. One might interpret the prosecution's comments as an explanation of Moore's motive: Moore picked Dixon's place because it was an easy target. But assuming the argument was error, it was harmless.

The harmless error test from the *Seumanu* decision shows the California Supreme Court asking three questions. Did the court instruct the jury it must not be influenced by sympathy? Was there an instruction that the argument of counsel was not

9

evidence?  And was the evidence of guilt strong?  (*Seumanu*, *supra*, 61 Cal.4th at p. 1345.)  The answers here are yes, yes, and yes.

We need not linger on the first two points, which we have addressed in Section I.

As to the third point, the proof of guilt was strong.

The case was simple, and the evidence was lopsided.

There was no claim the police investigation was inaccurate or incomplete.  Police had Moore on video.  Moore did not challenge the video's accuracy.

There was no identity issue.  Police found Moore at the scene, where Moore admitted he had been trying to get into the apartment with a crowbar.  The only issue was his intent.  Moore said he was trying to get his own things out of Dixon's place.  But this was obviously just a clumsy and false improvisation.

We review the proof Moore created against himself through his words and actions.

Moore started the whole thing wrong.  He told police he used to live there three or four years ago, and the police asked him, "So what was going on earlier over here?"  Moore answered, "*I don't know, you have to ask them*."  But, if you asked them, all Dixon and Morgan knew was Moore, unannounced, was trying to come in through the back at 7:00 a.m. on a Sunday using gloves and a crowbar to pry open the metal security door.

Moore then claimed he was there because he thought "she" wanted him to pick "something" up, with her consent.  Moore never explained what the "something" was, or why Dixon might have it:  Moore had dated Morgan, not her elderly aunt Dixon.  Nor did Moore knock or shout or phone ahead for friends to let

10

him in.  Rather he went to the windows, and when they were locked he went to the back door.

This is not how you pick up something from a friend.

Nor did Moore give his I-am-here-to-pick-something-up explanation when Dixon surprised him as he tried to break into her home with his crowbar.  Nor did he give the explanation to Morgan when she approached with her mother.  Instead, Moore ran.

Running speaks louder than words.

Then Moore claimed a note gave him permission to enter Dixon's home.  This backfired when there was no note.

A tale this tall convicts the teller.  If there was error in the closing argument, it did not affect the result.

IV

Moore and the prosecution correctly agree the jury's "person present" finding pursuant to section 667.5, subdivision (c)(21) must be stricken.

Section 667.5, subdivision (a) authorizes a sentence enhancement where a prior felony conviction and the new offense are violent felonies specified in subdivision (c).  (*People v. Bedolla* (2018) 28 Cal.App.5th 535, 541 (*Bedolla*).)  Section 667.5, subdivision (c)(21) lists first degree burglary with a person present in the residence as a "violent felony."  However, *attempted* first degree burglary is not on the list.

On its verdict form, the jury found true the allegation that "a person who was not an accomplice to the crime was present on the premises during the commission of the crime within the meaning of Penal Code § 667.5, subd. (c)."  The court did not enhance Moore's sentence based on this finding.

11

Nonetheless, section 667.5, subdivision (c) does not apply to attempt crimes.  (*Bedolla, supra,* 28 Cal.App.5th at p. 541.)  We accordingly strike the jury's finding a person was present.

## DISPOSITION

We strike the jury's finding pursuant to section 667.5, subdivision (c)(21) and affirm the judgment.


WILEY, J.


We concur:


BIGELOW, P. J.


GRIMES, J.