Filed 6/24/22  P. v. Moua CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C092603 |
| Plaintiff and Respondent, | (Super. Ct. No. 19FE017568) |
| v. | |
| FONG MOUA, | |
| Defendant and Appellant. | |

A jury found defendant Fong Moua guilty of 12 counts of lewd or lascivious acts on a child, involving six victims.  Defendant was sentenced to 238 years to life in state prison.

On appeal, defendant contends the trial court erred by:  (1) denying his motion to dismiss for violation of his right to a speedy trial; (2) admitting evidence of uncharged sexual offenses; and (3) admitting expert testimony on the child sexual abuse accommodation syndrome (the syndrome).  We affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

I

*The Crimes*[1]

Defendant and Lor were in a long-term relationship. Between the two were several children, including daughters Mindy, Pangfoua, and Isabella; and sons Xou and Leng. When Mindy was in the fifth or sixth grade, defendant began touching her. He would come to her bedroom at night and touch her breasts under her clothes and touch her vagina over and under her clothes. Mindy shared a bed with Pangfoua, and Xou was in the room in his own bed. Mindy did not recall the number of times defendant touched her breasts, but it was more than once. Defendant touched Mindy's vagina "a lot." Mindy did not tell her mother because she was afraid of defendant and ashamed. Mindy did not know if her mother would believe her. Mindy never told her siblings, including Pangfoua, who never woke up during the abuse.

One time, Mindy woke up while defendant was touching her. She turned on the light and asked what defendant was doing. Defendant said he was looking for something. Mindy told him there was nothing to look for and to get out of her room. Mindy would also lock the door to keep defendant out of her bedroom. Defendant kept touching Mindy until she was 17 or 18 years old. From when Mindy was nine until she was 13, defendant touched Mindy four or five times a week. When Mindy was 12 or 13, defendant touched Mindy on her breasts and vagina a couple of times when she was asleep on the couch.

Pangfoua was nine the first time defendant touched her inappropriately. The first time was when defendant was taking Pangfoua and Mindy to school. Defendant dropped off Mindy and told Pangfoua he was taking her to McDonald's. Instead, defendant took her to the American River and "parked out in the middle of nowhere." Pangfoua was sitting in the back seat and defendant came around the car and opened her door. He touched Pangfoua's feet and

---

[1] Pursuant to California Rules of Court, rule 8.90(b)(4), (10), (11) we identify sexual abuse victims by their first names or initials.

2

up her bare leg toward her thigh. Defendant told Pangfoua to be quiet. Pangfoua screamed at him to stop and take her back, and defendant did. Other times when defendant was driving the car, he would reach over to the back seat and try to touch Pangfoua's leg and pull her closer. Defendant was never able to touch her vaginal area during these interactions.

At night when Pangfoua was sharing a bed with Mindy, there were times when defendant would come into the room and lift the blanket and touch her feet, causing Pangfoua to wake up. Pangfoua would ask defendant what he was doing and defendant would say he was looking for stuff. Pangfoua did not recall Mindy ever waking up.

Another time, when Pangfoua was about 13 years old, she was playing hide-and-seek at defendant's sister's house with defendant's niece. Defendant told Pangfoua to lay on a bed with him, to be quiet, and that everything would be okay if she did not tell anyone. He closed the door to the bedroom, got on the bed with Pangfoua, and put a blanket over them. Defendant told Pangfoua to turn sideways, so his front was to her back. Defendant pulled down Pangfoua's pants and underwear and put his penis inside her vagina. It hurt. When defendant stopped, Pangfoua ran to the bathroom, closed the door, and wiped herself. There was blood. Pangfoua came out and went back to playing with defendant's niece like everything was normal.

After that, Pangfoua did not feel safe in the house with defendant and left to live with her boyfriend Daivi. At times, Pangfoua would still go back and stay overnight at her mother's house. One time when Pangfoua was 16, Daivi dropped her off to visit her mother and she slept over. She was asleep in a bedroom and defendant came in and rubbed her vagina on top of her clothes. Pangfoua woke up and screamed. Her brother Leng was in the kitchen and he asked her what happened. Pangfoua told him that defendant touched her. Leng said he did not believe her. Pangfoua never told anyone else about defendant's conduct. When she was nine, defendant told her not to tell her mother, and if Pangfoua did, she would get in trouble. Pangfoua felt disgusted and scared.

Pangchan dated Xou starting when the two were in high school. When she went over to visit, defendant was there. Once when she was sleeping in the living room with Xou, in the

3

middle of the night, Pangchan woke up and felt defendant rubbing her vaginal area. Pangchan saw defendant's face when he pulled away because of the light by the stairs. Defendant's hand was under the covers and over Pangchan's clothes. Pangchan was scared and crying. She told Xou, who got angry, but Pangchan told him not to say anything and they went back to sleep. Pangchan did not want Xou to say anything because she was ashamed and embarrassed. She was afraid people would say it was her fault. Xou did not tell anyone because Pangchan told him not to. Pangchan did not tell anyone. Another time, Pangchan and Xou fell asleep during the day watching television. She woke up to someone touching her breast. She did not see defendant's face but knew it was him because of prior conduct. She did not tell anyone.

When Isabella, who was several years younger than her sisters, was in the fourth or fifth grade, defendant, her father, started touching her inappropriately. He did this until she was in the seventh or eighth grade. Defendant started by giving her massages in his and Lor's bed and then he would touch her inappropriately. Sometimes Isabella would fall asleep watching television in her parent's bed and later wake up to her father putting his hand under the covers to touch and rub her "butt," "inner thighs," and vagina under her shorts. Defendant would grab Isabella's legs and thighs and then go inside her with his fingers, which hurt. Isabella would tell defendant to stop and he would. He never said anything. Sometimes this would happen on the couch in the living room, when Isabella would fall asleep watching television. In total, this happened more than six times but less than 10 times.

Several years passed. Pangchan married Xou and Pangfoua married Daivi, and each couple had children. Pangchan and Xou lived with defendant and Lor, as did Isabella and Mindy, who had daughter J. Although Mindy and defendant did not fight, they were not close. Mindy was not happy that defendant did not pay rent, and she and her siblings wanted him to work so he would pay for living expenses like everyone else, but defendant refused. Mindy and Pangfoua also knew defendant had cheated on their mother in the last several years, likely giving her a sexually transmitted disease.

4

Many of the grandchildren, in addition to Pangchan's niece, A., came to the house to visit with Lor and defendant. Defendant would often take the grandchildren to McDonald's and the park and pick them up from school.

In early August 2019, Isabella told Pangfoua defendant had touched her inappropriately. This caused Pangfoua to call Mindy and Pangchan and have a meeting with Lor about defendant's conduct. All four women told Lor defendant had touched them inappropriately when they were young. Lor was shocked.

The interaction caused Mindy to talk with her daughter J. Mindy asked J. if anybody had touched her or done something bad to her. J. at first denied it, but after two or three times of questioning, she admitted defendant had touched her while Mindy was at work and she was watching television with defendant in his room. At first, J. said defendant had touched her one time. After Mindy questioned her a second and third time, J. said defendant had a touched her "[a] lot of times." J. said defendant had touched her "[d]own there." J. never told Mindy because defendant told her not to and, if J. told Mindy, J. would get in trouble and Mindy would yell at her.

The meeting also caused Pangchan to ask her six-year-old niece A. if defendant had touched her. In a telephone call, A. initially said he did not, and then said defendant holds her hands. A. said she was scared that Pangchan would be angry with her; Pangchan told A. she wanted to know the truth. When Pangchan saw A. the next day, she asked where defendant touched her, and A. pointed to her private area. A. said it happened when defendant took the children to the park. A. later told her mother about defendant's conduct. At trial A. testified defendant touched her "pee-pee" and her butt outside of her clothes when they went to a park. Defendant's conduct made A. "mad" and she told defendant to stop.

5

## II

### *Pretrial Proceedings*

#### A

### *Motion To Dismiss*

In 2019, the prosecution filed a complaint against defendant, after which he was arraigned and held to answer on all charges after a preliminary hearing, and he entered a not guilty plea. On February 20, 2020, defendant waived time for trial, a trial readiness conference was scheduled, and March 26, 2020, was set as the date for the commencement of a jury trial. Thereafter, the Governor's declaration of an emergency due to the COVID-19 pandemic and emergency orders issued by the Governor, Chief Justice Tani Cantil-Sakauye as Chairperson of the Judicial Council and the Presiding Judge of the Sacramento County Superior Court resulted in a 60-day extension of the time period to hold a criminal trial beyond the last day the statutory deadline would have otherwise expired.

On May 20, 2020, defendant filed a motion to dismiss contending the emergency orders suspending jury trials for 60 days due to the COVID-19 pandemic, including the March 30, 2020, order issued by the Chief Justice, violated his constitutional right to a speedy trial and the statutory timelines set forth in section 1382 and Government Code section 68115.

On June 18, 2020, the prosecution responded, arguing the government had broad police powers to act in an emergency to protect the health and safety of the public, the Chief Justice exercised lawful authority under Government Code section 68115, and that statute, as well as section 1382, provide that a criminal trial may be continued for "good cause."

On June 24, 2020, the trial court issued an order denying the motion to dismiss. The court overruled defendant's objections to the emergency orders issued by the Chief Justice and the presiding judge of the superior court. The court found good cause to continue trial, citing the Chief Justice's findings regarding the COVID-19 pandemic, supplemented by the stay-at-home order issued by the Sacramento County public health officer. Defendant's trial commenced the next day.

B

*Motions In Limine Nos. 3, 6, And 7*

On June 24, 2020, the trial court heard the parties' motions in limine. Defendant's appeal concerns the court's rulings on motions in limine Nos. 3, 6, and 7.

In motion in limine No. 3, the prosecution sought to introduce evidence based on Sacramento and Stockton police reports of uncharged crimes of moral turpitude involving defendant's girlfriend Lor and his daughter K. to impeach defendant should he testify.

The motion summarized the uncharged conduct as follows:

In July 2003, Lor reported to Sacramento police that she was two months pregnant with defendant's child when she found out he was married. Defendant took her to an abortion clinic and tried to punch her in the stomach when she refused to go inside the clinic. He put his hands around her neck and she woke up in the hospital. No charges were filed against defendant.

In September 2003, Lor reported to Sacramento police that defendant came to her apartment to talk to her about the pregnancy. When she let him in, defendant wanted to have sex. He twisted her arm, dragged her down the hall, pushed her on the bed, took off her clothes, forced himself on top of her, and raped her. An investigation determined that Lor had consensual sex with defendant after the rape and he had been there the day before. Lor agreed to drop the matter after receiving a payment of $7,000 from defendant, which Lor did not disclose to law enforcement. No case was filed.

In February 2004, the Stockton Police Department investigated a report that defendant molested his daughter K. In interviews with law enforcement officers, K. stated defendant slid his hands under her pajama bottoms and touched her vaginal area. A case was filed but dismissed for undetermined reasons. At the time, defendant produced a witness's statement referencing a video in which K. recanted the allegations.

When arguing defendant's prior acts were inadmissible, defense counsel argued there must be some threshold showing the events were true for the trial court to act in its capacity as gatekeeper of the evidence. Counsel argued the rape involving Lor did not meet the threshold

7

because it occurred in 2003 and defendant was never convicted of the offense. Further, the case was never charged based on a finding by the district attorney that Lor was not credible. Defense counsel further argued the case involving K. did not meet the threshold because it was 17 years old, was dismissed, and the basis for the dismissal had not been determined. Defense counsel contended that under Evidence Code section 352, this evidence should be excluded as unduly prejudicial.

The prosecutor responded that the crime involving K. was child molestation, which is a crime of moral turpitude, and there is no requirement defendant be convicted to introduce the evidence. The crime against Lor -- rape -- was also a crime of moral turpitude. On that basis, the prosecutor requested the evidence be admitted as impeachment if defendant testified.

Defense counsel thereafter pointed out that the circumstances involving Lor -- an allegation of rape by a person who was in a dating relationship with defendant, was an adult, a mother of six, had had prior consensual sex with defendant, lived with him, and had three children with him -- was dissimilar factually from the present charges. The prosecutor responded the crimes of moral turpitude do not require similarity, a factor relevant to Evidence Code section 1108. The court granted motion in limine No. 3.

The prosecution filed motions in limine Nos. 6 and 7, respectively, to introduce evidence of defendant's uncharged conduct involving K. under Evidence Code sections 1108 and 1101, subdivision (b), and to preclude evidence that the charge was dismissed.

Defense counsel objected to the admission of this evidence under Evidence Code section 352 arguing that proving the allegations would create the need for a trial within a trial resulting in undue consumption of time, pointing out that the prosecutor had listed multiple witnesses to the events involved. As with the opposition to motion in limine No. 3, defense counsel contended the events were remote in time, and, although a serious section 288 offense was charged, it could not be determined why the case was dismissed, and due to the passage of time, the defense was deprived of the opportunity to put on a full defense.

8

The prosecution argued K. would be the principal witness and other witnesses may not be needed. The fact the case was dismissed was not relevant and should be excluded. The prosecutor further argued the evidence was probative under Evidence Code section 1101, subdivision (b), as a common plan or scheme, as well as relevant to specific intent and mistake, in that defendant often claimed he was looking for something when he was caught touching a child's vaginal area. The evidence was also admissible, the prosecutor argued, as propensity evidence under Evidence Code section 1108. The prosecutor noted there was no time requirement for admission of evidence under either Evidence Code sections 1101 or 1108, with evidence as old as 25 to 30 years being admitted.

Addressing motion in limine No. 7 specifically, defense counsel argued the defense should be permitted to introduce the fact that the charge was dismissed to obviate speculation that defendant had been convicted and for the jury to ascribe the appropriate weight to the evidence.

The court granted motions in limine Nos. 6 and 7, excluding the fact the charges involving K. were dismissed.

### III

### *Relevant Trial Proceedings*

### A

### *Prosecution's Expert Testimony*

Doctor Blake Carmichael testified as an expert witness in child sexual abuse, including the syndrome. Carmichael explained that the syndrome is a tool to help people understand children who have been sexually abused to counter "a number of myths and misconceptions people have about child victims of sexual abuse, why they may not tell right away or expectations that kids will remember certain things that happened to them when in fact that may not be the case for a number of kids."

The syndrome is not used to diagnose child sexual abuse, which is a crime, not a mental health condition. The syndrome is not intended to determine if a child has been sexually abused.

9

Carmichael acknowledged there has been a debate that the syndrome is "junk science" or "can't be used for anything, which is not true because it can educate people and give a context for understanding child sexual abuse victims."

Carmichael described the five components of the syndrome: "The first is secrecy. The second is helplessness. The third is entrapment or accommodation. . . . The fourth is delayed, unconvincing, or conflicting disclosure. And then the last one is recanting or retraction." He then elaborated on each component before testifying that research has shown a child will fail to tell about abuse in response to open-ended questions, and sometimes it takes specific questions for children to talk about the abuse. Carmichael also testified research showed false memories can occur only after false information with a plausible context or an existing event is given to a child on a repetitive basis. False memories about positive or neutral events are much easier to create than about negative events for which a child has no context, like sexual abuse.

Carmichael also testified children who have been abused are more resistant to suggestive questioning. It is understood that interviewers want to stay open-ended and let the child lead the conversation. But at some point, leading questions and yes-or-no questions are appropriate and do not lead to inaccuracies.

On cross-examination, Carmichael agreed research showed parents initiate the majority of false allegations in the context of a custody dispute, but even in that context, the rate of false allegations is quite low. Carmichael testified that a sizable minority of children recant. Carmichael agreed there is no diagnostic tool to determine whether children have been abused.

B

*Defense's Case*

Dr. Julie Buck testified as an expert witness in child interviewing techniques, memory, and the syndrome. Buck testified some people continue to support the syndrome though scientific findings are contradictory regarding the syndrome. Buck acknowledged that the syndrome evidence had been admitted in California courts since 1991.

10

Buck testified to the importance of open-ended questioning of children and the way their memories are created and retrieved for purposes of recounting what happened to them. Specifically, Buck testified that if asked a yes-or-no question or a question giving options, the answer is likely to contain information not accessible in memory storage and information that is implied in the question being asked. Children tend to be more vulnerable to "source misattribution" because their memory systems and skills are still developing. The substantive interview should start with open-ended questions.

Defendant's colleague from the time he was a security guard testified as a character witness. Defendant first worked as a security officer and then as a security supervisor, on the graveyard shift from midnight to 8:00 a.m., Monday through Friday, from 2006 to 2013, when he was discharged. On cross-examination, defendant's colleague stated that most of the time an employee was discharged due to performance issues.

Defendant's sister testified that, from 2003 to 2006, defendant would visit her at her house and she did not recall him coming over with Pangfoua alone. When defendant would come over with Lor and bring her children, defendant usually would be with the adults. Observing defendant interacting with his own children, defendant's sister believed defendant had a normal, father-and-child relationship. Observing defendant with her own children, defendant's sister never noticed anything out of the ordinary or anything that gave her a sense of sexually inappropriate conduct. Defendant's sister believed he was innocent of the allegations of sexual abuse.

Defendant testified. Defendant married Maria in 1990. They were married for 14 years. Defendant met Lor in March 2003 when he was still married to Maria. Lor was his mistress and the two had a sexual relationship.

Defendant moved in with Lor and her children in the summer of 2004. Even though he took them hunting, to Six Flags, and to the snow, Pangfoua and Mindy did not accept him as a stepfather. They resented him and did not like him. The relationship did not improve as the

11

girls got older -- they were disobedient and rebellious and would not listen to defendant or Lor. Defendant was never alone with the children when they went places; Lor was always with him.

Defendant denied taking Pangfoua to a remote location near a river and trying to touch her leg. He also denied having sexual intercourse with Pangfoua at his sister's house or going into Pangfoua's and Mindy's bedroom at night to touch them. Defendant further testified he never allowed his stepson Xou to have Pangchan spend the night when the two dated in high school. Defendant did not recall Pangchan sleeping on the couch with Xou during the day while defendant was living there. Defendant also testified he never touched J. or A. inappropriately.

At the time Isabella told Pangfoua about the abuse, Isabella was angry at defendant and rebellious. She would sneak her boyfriend into her room and lock the door even though defendant told her boys were not allowed. Pangfoua was very close with Mindy and Pangchan and they would go to nightclubs together nearly every Friday.

Defendant testified he did not physically assault Lor in July 2003. Defendant explained that Lor got pregnant and wanted defendant to marry her. He told her he could not because he was married to Maria, and Lor got depressed and ill. Defendant called 911 for her and she was taken to the hospital. Defendant learned from a Sacramento police detective that Lor accused him of physically assaulting her but the two continued to have a consensual sexual relationship and the charges were never filed. Defendant admitted when Lor became pregnant with his child, he did not want her to have the baby and told her to get an abortion. Defendant denied he threatened to punch Lor so she would abort the child. Defendant gave Lor $7,000 when she became pregnant and he could not marry her. Such a gift is a common cultural practice to save face in the Hmong culture. The payment was Lor's idea. Defendant moved in with Lor in 2004 after K. made allegations of sexual assault against him, and he and Lor had three children together thereafter.

Defendant also denied raping Lor in September 2003. Defendant explained that he and Lor were having consensual sex one day when defendant's wife Maria came banging on the door. Defendant wanted to leave and Lor tried to stop him but he broke free and left. Later

12

when the police came, Lor said defendant raped her and filed false charges to that effect. They continued to have a relationship and consensual sex after that allegation. Following this incident, Maria also falsely accused defendant of assaulting her. Defendant admitted he told Lor in a telephone call that he pressured her a "little bit" to have sex.

Defendant's wife Maria and daughter K. were aware defendant had a mistress and were very angry at him. Maria would try to stop defendant from seeing Lor and would jump on the car when he tried to leave.

Defendant testified K. accused defendant of sexually abusing her but eventually admitted it was a lie. Lor and her children knew about the allegation. Defendant did not have a relationship or communicate with K. after she made allegations of sexual misconduct.

On August 8, 2019, Lor told defendant the children accused him of touching them inappropriately and that he should leave the house because of the allegations. Defendant was angry and surprised; he did not believe it and neither did Lor. Lor told him if he left, they would not call the police. Defendant was intimidated and left. Defendant then got a job and an apartment.

Mindy called defendant on the telephone and accused him of sexually abusing her and J. He responded that he did not. Defendant told Mindy to check J.'s hymen to prove his innocence. Defendant did not know the police were monitoring the call.

Isabella also called defendant around the same time and accused him of touching her inappropriately. Defendant responded that he raised and bathed her but never touched her inappropriately. He told Isabella there must be a traitor that asked her to make these allegations against him. He was referring to Mindy, Pangfoua, and Daivi, who defendant believed were in a conspiracy against him. In this phone call, Isabella told defendant Lor wanted her to talk to child protective services. Defendant responded by telling Isabella that nothing happened and not to say anything bad and that it was just a misunderstanding. Defendant did not know this conversation was being monitored by police.

13

When detectives visited defendant, he wanted to tell his side of the story. He said that the stepchildren wanted to kick him out for not paying rent. Detectives asked defendant if he touched A. inappropriately in the bathroom at the park, and defendant told them there was no bathroom at the park. When defendant lifted a child to a swing, it might have been mistakenly believed to be sexual.

On cross-examination, defendant admitted that in September 2019 he studied the Penal Code regarding what the prosecution had to prove to convict him and determined that he had to "have the intent to touch [the children] willfully," but he did not have that intent.

DISCUSSION

I

*The Trial Court Did Not Abuse Its Discretion*

*By Finding Good Cause To Continue Defendant's Trial*

Defendant contends his conviction should be reversed for violation of his right to a speedy trial. Defendant argues that the Governor's Executive Order N-38-20 and the closure orders of the Judicial Council violate the separation of powers and the prosecution failed to make an individualized showing of good cause why defendant could not be brought to trial within the statutory deadline.

In *Stanley v. Superior Court* (2020) 50 Cal.App.5th 164 (*Stanley*), the appellate court addressed similar contentions. In that case, as here, the defendant's trial was continued by orders of the Governor and the Chief Justice in response to the COVID-19 pandemic. (*Id.* at pp. 167-168.) The court in *Stanley* summarized the orders as follows: "On March 4, 2020, Governor Gavin Newsom declared a state of emergency in response to the global outbreak of COVID-19, a 'new disease, caused by a novel (or new) coronavirus that has not previously been seen in humans.' (Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), Frequently Asked Questions <https://www.cdc.gov/coronavirus/2019-ncov/faq.html> [as of June 9, 2020].)" (*Stanley*, *supra*, 50 Cal.App.5th at p. 167.)

14

"On March 23, 2020, Chief Justice Tani Cantil-Sakauye, in her capacity as Chairperson of the Judicial Council, issued an emergency statewide order pursuant to Government Code section 68115 suspending all jury trials and continuing them for a period of 60 days.  The Chief Justice also extended by 60 days the time period provided for in Penal Code section 1382 for holding a criminal trial." (*Stanley*, *supra*, 50 Cal.App.5th at p. 167.)  The Chief Justice explained that the courts could not operate as usual and the courts would comply with the social distancing restrictions recommended by the Centers for Disease Control, the California Department Public Health, and local county health departments.  (*Ibid.*)

"On March 27, 2020, the Governor issued Executive Order N-38-20.  The order suspended any limitations in Government Code section 68115 or any other provision of law that limited the Judicial Council's ability to issue emergency orders or rules, and suspended statutes that may be inconsistent with rules the Judicial Council may adopt." (*Stanley*, *supra*, 50 Cal.App.5th at pp. 167-168.)

"On March 30, 2020, the Chief Justice issued a second statewide emergency order, authorizing superior courts to issue implementation orders that '[e]xtend the time period provided in section 1382 of the Penal Code for the holding of a criminal trial by no more than 60 days from the last date on which the statutory deadline otherwise would have expired.' " (*Stanley*, *supra*, 50 Cal.App.5th at p. 168.)

"On April 29, 2020, the Chief Justice issued a third statewide emergency order, stating: 'The 60-day continuance of criminal jury trials and the 60-day extension of time in which to conduct a criminal trial under Penal Code section 1382, both of which I first authorized in my order of March 23, 2020 are to be extended an additional 30 days.  The total extension of 90 days shall be calculated from the last date on which the trial initially could have been conducted under Penal Code section 1382.' " (*Stanley*, *supra*, 50 Cal.App.5th at p. 168.)

In addition, as in *Stanley*, a Sacramento County health officer issued "stay-at-home" orders (on May 1 and May 26, 2020) and the Presiding Judge of the Sacramento County

15

Superior Court issued an order (on March 17, 2020) extending the time limits in section 1382 by 30 days.

In *Stanley*, after the trial court denied a motion to dismiss, the defendant filed a petition and writ of mandate to challenge that order. (*Stanley*, *supra*, 50 Cal.App.5th at p. 168.) In this instance, the trial court denied a motion to dismiss, a trial was conducted, the jury found defendant guilty of 12 counts of child sexual abuse, and defendant appealed. However, the issue presented is the same: whether the Governor's executive order and the Chief Justice's statewide emergency orders were "unauthorized by statute and violate separation of powers." (*Stanley*, *supra*, 50 Cal.App.5th at p. 168.)

The *Stanley* court questioned the merits of the defendant's claims but concluded the matter "may be resolved on a much simpler basis." (*Stanley*, *supra*, 50 Cal.App.5th at p. 168.) "Penal Code section 1382 provides that an action shall be dismissed if trial is not commenced within the statutory time limits 'unless good cause to the contrary is shown.' (Pen. Code, § 1382, subd. (a).) 'The cases recognize that, as a general matter, a trial court "has broad discretion to determine whether good cause exists to grant a continuance of the trial" [citation], and that, in reviewing a trial court's good-cause determination, an appellate court applies an "abuse of discretion" standard.' [Citation.] '[I]n making its good-cause determination, a trial court must consider all of the relevant circumstances of the particular case, "applying principles of common sense to the totality of circumstances." ' " (*Id.* at p. 169.)

The court observed that "[h]ealth quarantines to prevent the spread of infectious diseases have long been recognized as good cause for continuing a trial date." (*Stanley*, *supra*, 50 Cal.App.5th at p. 169, citing *In re Venable* (1927) 86 Cal.App. 585, 587 [no juries called during epidemic of infantile paralysis], & *People v. Tucker* (2011) 196 Cal.App.4th 1313, 1318 [upholding one-week delay where defendant was in custody in correctional facility where a prisoner contracted H1N1 flu, concluding that "[p]ublic health concerns trump the right to a speedy trial"].)

16

The court in *Stanley* acknowledged that although the 90-day continuance occasioned by the Governor's and the Chief Justice's orders was "far longer than the continuances in *Venable* and *Tucker*, the COVID-19 pandemic is of such severity as to justify a continuance of this length." (*Stanley*, *supra*, 50 Cal.App.5th at p. 169.) The court observed: "Despite state and local shelter in place orders throughout the country, including in California and Contra Costa County, according to the Centers for Disease Control and Prevention there have been almost two million cases of COVID-19 in the country and over 110,000 deaths caused by the virus. California itself has seen nearly 130,000 cases and over 4,600 deaths. (Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), Cases in the U.S. <https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html> [as of June 9, 2020].) As the Chief Justice explained in her most recent emergency order: '[C]ourts are clearly places of high risk during this pandemic because they require gatherings of judicial officers, court staff, litigants, attorneys, witnesses, defendants, law enforcement, and juries -- well in excess of the numbers allowed for gathering under current executive and health orders.' Under these circumstances, the trial court unquestionably was justified in finding that the COVID-19 pandemic constitutes good cause to continue defendant's trial . . . . Given the grave risks to court personnel, jurors, attorneys, and the defendant himself that would be created by proceeding in accordance with the normal timeline, any other conclusion would have been unreasonable in the extreme." (*Stanley*, *supra*, at pp. 169-170; *People v. Tucker*, *supra*, 196 Cal.App.4th at p. 1314 ["Good cause for the delay of trial exists when an incarcerated criminal defendant is under quarantine to prevent the spread of infectious disease. A contrary holding would require trial court personnel, jurors, and witnesses to be exposed to debilitating and perhaps life-threatening illness"].)

The reasoning of the court in *Stanley* is equally valid in this case and provides a basis for a particularized finding of good cause to extend defendant's trial, irrespective of the constitutionality of the emergency orders. Accordingly, we conclude the trial court did not

17

abuse its discretion by denying defendant's motion to dismiss claiming a violation of his right to a speedy trial.[2]

## II

*The Trial Court Did Not Abuse Its Discretion By Admitting*

*Evidence Of Defendant's Prior Bad Acts Involving Lor And K.*

Defendant contends the trial court prejudicially erred by admitting evidence that in 2003 he threatened and raped Lor and in 2004 K. accused him of molesting her.

As discussed in the background section, the prosecutor moved in limine to admit evidence of these prior incidents of misconduct to impeach defendant if he testified and separately to admit evidence of K.'s accusations under Evidence Code section 1101, subdivision (b), as evidence of intent, absence of mistake or accident and common plan or scheme, and prior sexual offenses under Evidence Code section 1108. The court granted both motions, as well as a motion to exclude evidence that K.'s charges were dismissed. Defendant contends the court erred because "there was no predicate proof of the truth of the prior uncharged acts to establish disposition, no prior conviction with which he could be impeached."

Turning first to the motion regarding impeachment evidence, this evidence was offered to impeach defendant's credibility with prior acts of moral turpitude. Defendant does not dispute the prior acts involved moral turpitude. Therefore, the trial court did not err in admitting this evidence simply because defendant was never convicted. "[A] witness's prior conduct involving moral turpitude is admissible to impeach his or her credibility 'whether or not it produced any conviction, felony or misdemeanor.' " (*People v. Campbell* (2020) 51 Cal.App.5th 463, 499, quoting *People v. Wheeler* (1992) 4 Cal.4th 284, 296-297; see also

---

[2] Based on our conclusion the trial court did not abuse its discretion, we need not reach the People's argument defendant's speedy trial claim fails under federal and state law because, inter alia, defendant failed to show prejudice from the continuance of his trial.

18

*People v. Hines* (2020) 58 Cal.App.5th 583, 609 [misconduct involving moral turpitude "need not relate to a felony conviction to be admissible"].)

"A witness may be impeached with any prior conduct involving moral turpitude whether or not it resulted in a felony conviction, subject to the trial court's exercise of discretion under Evidence Code section 352." (*People v. Clark* (2011) 52 Cal.4th 856, 931.) When the conduct resulted in a conviction, "the court should consider, among other factors, whether it reflects on the witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the decision to testify." (*Id.* at p. 932.) "Additional considerations apply when the proffered impeachment evidence is misconduct other than a prior conviction. This is because such misconduct generally is less probative of immoral character or dishonesty and may involve problems involving proof, unfair surprise, and the evaluation of moral turpitude. [Citation.] As we have advised, 'courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value.' " (*Id.* at pp. 931-932.)

Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion." (*People v. Clark*, *supra*, 52 Cal.4th at p. 932; *People v. Bedolla* (2018) 28 Cal.App.5th 535, 555 [" 'A trial court's ruling to admit or exclude evidence offered for impeachment is reviewed for abuse of discretion and will be upheld unless the trial court "exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice" ' "].)

To prove that defendant engaged in prior acts of moral turpitude, the prosecution can cross-examine him about the misconduct, which is what occurred in the trial here. (*People v. Wheeler*, *supra,* 4 Cal.4th at p. 300, fn. 14.) However, "[a] prosecutor may not ask questions of a witness suggesting facts harmful to a defendant without a good faith belief that such facts exist." (*People v. Pearson* (2013) 56 Cal.4th 393, 434.)

In cross-examining defendant, the prosecutor asked questions, inter alia, about whether defendant: (1) was forced to resign as a deputy sheriff after K. accused him of molesting her and not rehired when the accusation was dismissed; (2) threatened to punch Lor to get her to abort a child; (3) denied raping Lor but admitted pressuring her "a little bit" to have sex; and (4) admitted that K. alleged he sexually abused her when she was 12, but denied that he did.

Defendant has not shown that the prosecutor lacked a good faith basis for questioning defendant about these prior acts. Defendant acknowledges that "the prosecution's trial brief referenced police reports that detailed the prior rape and child molestation accusations," and Lor and K. were on the prosecution's witness list. Defendant's concession that he pressured Lor "a little bit" was consistent with an attempt to downplay a sexual assault. Defendant admitted that K. accused him of the same misconduct, i.e, touching her vagina, as described by six similarly situated witnesses in the case on trial. Although the trial court did not explain its reasoning in granting the prosecution's motion in limine, defendant has failed to make an affirmative showing of error in the admission of evidence of prior uncharged acts of moral turpitude for impeachment. (*People v. Clarida* (1987) 197 Cal.App.3d 547, 553.)

Regarding the motions directed at admitting evidence under Evidence Code sections 1101, subdivision (b), and 1108, that defendant molested his daughter K., she did not testify. The only evidence touching on the subject was the prosecutor's cross-examination of defendant's sister, which did not mention the nature of the charges, and did mention the charges were dismissed: "Q. Did you know that charges were dropped against your brother in Stockton? [¶] A. Yes. [¶] Q. Did you have anything to with that at all -- talking to K[.]; talking to Maria -- about how it would ruin your brother's life? [¶] A. No."

To be sure, the misconduct involving K. was reported in 2004, some 18 years ago. However, "[n]o specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible." (*People v. Branch* (2001) 91 Cal.App.4th 274, 284.) "[I]f the prior offenses are very similar in nature to the charged offenses, the prior offenses have greater probative value in proving propensity to commit the charged offenses." (*Id.* at p. 285;

20

*People v. Hernandez* (2011) 200 Cal.App.4th 953, 968.)  Here, the prior offense was very similar to the charged offenses:  every single victim, who was pre-adulthood and in a familial relationship with defendant, testified to defendant touching her vagina in the same manner as K. reported.

Defendant contends that "[b]efore character or disposition evidence is admitted, the trial court must make a preliminary determination of the truth of the prior uncharged act sufficient for the jury to find that the defendant committed the prior misconduct."  The authority that defendant cites does not support the argument.  For example, defendant cites *People v. Jandres* (2014) 226 Cal.App.4th 340.  In that case, the court held that "the admissibility of uncharged conduct pursuant to [Evidence Code] section 1108 turns on the existence of a preliminary fact -- namely, that the uncharged conduct constitutes a statutorily enumerated 'sexual offense.' "  (*Id.* at p. 353; see also *People v. Cottone* (2013) 57 Cal.4th 269, 282 ["the trial court decides whether the charging document alleges a 'sexual offense' before it can consider admitting [Evidence Code section] 1108 evidence to prove propensity"].)  Thus, the required preliminary determination for purposes of Evidence Code section 1108 is that the prior misconduct involved a sexual offense, not a determination of the truth of the matter.

### III

### *The Trial Court Did Not Abuse Its Discretion By Failing*
### *To Exclude The Syndrome Evidence Under Kelly/Frye*

Defendant argues that his conviction should be reversed because expert testimony regarding the syndrome was admitted.  Defendant maintains this evidence does not meet the threshold showing required by *People v. Kelly* (1976) 17 Cal.3d 24, that the scientific community accepts this methodology.  (See also *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013.)  Defendant concedes that "California courts have not found a *Kelly* issue presented by admission of [the syndrome] evidence, which is permitted to rehabilitate a witness when the defendant suggests the child's conduct after the alleged abuse, is inconsistent with the claim of abuse, is inconsistent with the claim of abuse as ' "[s]uch expert testimony is needed to disabuse

21

jurors of commonly held misconceptions about child sexual abuse, and to explain the emotion antecedents of abused children's seemingly self-impeaching behavior." ' "  Defendant quotes *People v. McAlpin* (1991) 53 Cal.3d 1289, and acknowledges "this Court's obligation to apply *McAlpin* to this case," but invites us to "record disagreement" with that decision.  We decline the invitation and continue to follow our prior decisions and decisions of our sister courts to admit expert evidence on the syndrome without subjecting it to the *Kelly* test.  (See *People v. Sandoval* (2008) 164 Cal.App.4th 994; *People v. Munch* (2020) 52 Cal.App.5th 464.)

DISPOSITION

The judgment is affirmed.


/s/
Robie, Acting P. J.


We concur:


/s/
Hoch, J.


/s/
Earl, J.


22