Filed 11/12/25  P. v. McFadden CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>TRAYVON DESHON MOORE MCFADDEN,<br><br>Defendant and Appellant. | B338006<br><br>(Los Angeles County<br>Super. Ct. No. YA102039) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura C. Ellison, Judge.  Affirmed.

Sandra Gillies, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Kristen J. Inberg and Megan Moine, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Trayvon Deshon Moore McFadden appeals from the judgment after a jury convicted him of second degree murder and found true a firearm allegation. The trial court sentenced McFadden to a prison term of 45 years to life, plus 25 years to life for the firearm enhancement. McFadden argues the trial court erred in giving CALCRIM No. 335, a jury instruction his trial counsel requested that concerns how the jury should consider accomplice testimony. McFadden challenges the language of the instruction and the court's failure to define one of the terms in the instruction. McFadden also argues the court abused its discretion in refusing to strike the firearm enhancement because, according to McFadden, the court used the wrong legal standard to find striking the enhancement would endanger the public. We affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

### A.    *McFadden Kills Kenneth Onah*

In the afternoon of January 10, 2020 Latavia Wicker and Kenneth Onah agreed, through an exchange of text messages, Onah would pay Wicker $250 for her to drive from San Diego to Gardena, where Onah lived, for "fun." Wicker arrived at Onah's apartment at approximately 9:30 p.m. Wicker and Onah talked, smoked, drank, and watched television. Toward the end of the evening, Wicker felt Onah was "acting weird." Onah asked Wicker to spend the night, and she said, "I don't do that." Onah told Wicker that she could leave, and Wicker said, "Well, let me call my ride." Onah said, "Just for that . . . I'm only going to give

2

you gas money." Onah at first gave Wicker $50, but later offered her $100. As Wicker prepared to leave Onah's apartment, she and McFadden (whom Wicker later described as her ex-boyfriend) exchanged a series of text messages, which began with Wicker telling McFadden that Onah was only giving her gas money:

> Wicker: "This [guy] only trying to give $100. [What] do I do now?"
> McFadden: "Wym"[1]
> McFadden: "Wasp with that play drink"[2]
> Wicker: "He not drinking"
> McFadden: "Figure it out"
> Wicker: "What start trippen? I don't know how to get out of here tho"
> McFadden: "So how much he got . . ."
> Wicker: "$100 supposedly but he got cards n there's phones n shit I bet I haven't been all around the room yet"
> McFadden: "Yeah see what's in there . . . . Game time"

At approximately 12:15 a.m. (i.e., early the next morning) Wicker left Onah's apartment and went outside. Onah followed her, and when they arrived at the parking lot gate, McFadden was standing there. According to Wicker, Onah "was basically

---

[1] Meaning, "What [do] you mean?" (*Garcia v. State of Texas* (Tex.App., July 25, 2023, No. 05-22-00526-CR) 2023 WL 4731296, p. 7.)

[2] Meaning, according to one of the detectives, the drink may have been "spiked." And with wasp probably meaning, "What's up."

3

rambling on" about not giving Wicker the full amount of money he promised. McFadden and Onah continued "talking," and at some point McFadden fired his gun at Onah. One of the bullets struck Onah in the chest, killing him.

McFadden and Wicker jumped the fence of the parking lot, got into McFadden's car, and drove back to San Diego. Three days later, police officers in San Diego stopped a car Wicker was driving; McFadden was sitting in the front passenger seat. McFadden fled, ran through an alley, and threw away a gun before the officers apprehended him.

B.    *The Jury Convicts McFadden of Second Degree Murder and Finds True the Firearm Allegation*

The People charged McFadden with willful, deliberate, and premeditated murder (§ 187, subd. (a))[3] and alleged he personally and intentionally discharged a firearm causing great bodily injury or death (§12022.53, subd. (d)). At trial a criminalist testified that McFadden contributed 85 percent of the DNA found on the gun the police officers in San Diego recovered in the alley and that Wicker contributed nine percent. Another criminalist testified the two bullet casings the detectives found outside Onah's apartment complex and the bullet in Onah's chest came from the same gun. An intelligence analyst who mapped the cell phone usage of McFadden's cell phone testified that, between 12:06 a.m. and 12:30 a.m. on January 11, 2020, which included when the shooting occurred, the cell phone was "hitting towers that are nearest in their direction to" the address of Onah's apartment complex.

---

[3]    Statutory references are to the Penal Code.

4

Wicker testified McFadden was her ex-boyfriend, admitted she saw him in court, but refused to identify him. Though she admitted she was "honest" when detectives interviewed her in May 2020, Wicker denied, or said she could not recall, making most of the statements in that interview. The prosecutor played the video of the interview for the jury.[4]

In the interview Wicker denied shooting Onah, but admitted she went to his apartment on the evening of January 10, 2020. Wicker told the detectives that, when she told Onah that she would not spend the night with him and Onah said he would not give her the $250 they had agreed on, Wicker left the apartment. She said that Onah followed her and that McFadden was standing by the gate to the parking lot for the apartment complex. Wicker stated the three of them stood by the gate talking about why Onah would not give Wicker "what she asked for." Wicker told the detectives that she was "in a haze" as McFadden and Onah talked and that, at some point, she heard a gunshot. Wicker said she did not see who shot Onah. When asked why McFadden shot Onah, Wicker initially said, "That's between them," but later in the interview suggested McFadden "probably didn't like what [Onah] was saying." When asked whether it was "common sense" that McFadden must have shot Onah, Wicker nodded and said she was "not going to say names" because she was not a "snitch." At the end of the interview, one of the detectives told Wicker, "We're done. But, you know, I mean, you're a liar."

---

[4]     Outside the presence of the jury the court found Wicker was "purposefully uncooperative" and ruled statements from her interview with the detectives were admissible as prior inconsistent statements.

The jury found McFadden guilty of second degree murder and found true the allegation he personally and intentionally discharged a firearm causing great bodily injury or death. In a bifurcated proceeding the jury found McFadden had five prior convictions for first degree burglary, a serious or violent felony (depending whether a non-accomplice is present)[5] under the three strikes law. (See §§ 667, subds. (b)-(j), 1170.12, subds. (a), (d), 1197, subd. (c)(18).)

C.    *The Trial Court Sentences McFadden*

At sentencing the trial court denied McFadden's motion to strike his prior convictions and the People's request to strike the firearm enhancement. The court cited several factors in aggravation and none in mitigation and sentenced McFadden to 45 years to life on his conviction for second degree murder (15 years to life, tripled under the three strikes law), plus 25 years to life for the firearm enhancement under section 12022.53, subdivision (d), for a total sentence of 70 years to life. The court ordered McFadden to serve the sentence consecutive to "any other sentence" he was serving. McFadden timely appealed.

## DISCUSSION

A.    *The Court Did Not Err in Giving CALCRIM No. 335*

McFadden argues the trial court's decision to grant his request to give CALCRIM No. 335, which tells jurors they may not convict the defendant based solely on the statement or

---

[5]    See *People v. Mani* (2022) 74 Cal.App.5th 343, 367, footnote 7; *People v. Bedolla* (2018) 28 Cal.App.5th 535, 541.

6

testimony of an accomplice, "undercut" his "third party culpability defense in derogation of [his] federal constitutional rights." Specifically, McFadden contends that, because the court failed to define the term "accomplice," the instruction "effectively told the jury Wicker did not kill [Onah], thus gutting the defense theory of the case." To the extent this argument is not forfeited or barred by the doctrine of invited error, the trial court did not err in giving the instruction. There is no reasonable likelihood the jury understood or applied the instruction in the manner McFadden asserts.

### 1.  *Relevant Proceedings*

During a hearing on the proposed jury instructions, the prosecutor stated that he was "not sure" CALCRIM No. 335 was "required," but that he included the instruction on the list of instructions "out of an abundance of caution." The court asked counsel for McFadden, "Are you asking for this instruction?" Counsel for McFadden answered, "I am requesting [CALCRIM No.] 335." The court summarized the use note and recited one portion: "'Give this instruction only if the court concludes that the witness is an accomplice as a matter of law or the parties agree about the witness's status as an accomplice.'" The court asked, "So do you both agree about the witness's status as an accomplice?" Counsel for McFadden stated, "Yes. Well, I do." The prosecutor, referring to Wicker, stated: "Well, she was charged with [violating section 32], accessory after the fact. I think, out of an abundance of caution, I would put it in there." The court confirmed that both sides agreed the court should give CALCRIM No. 335.

7

The trial court instructed the jury with CALCRIM No. 335 as follows: "If the crime of murder was committed, then Latavia Wicker was an accomplice to that crime. And you may not convict the defendant of murder based on the statement or testimony of an accomplice alone. You may use the statement or testimony of an accomplice that tends to incriminate the defendant to convict the defendant only if: (1) the accomplice's statement or testimony is supported by other evidence that you believe; (2) that supporting evidence is independent of the accomplice's statement or testimony; and (3) that supporting evidence tends to connect the defendant to the commission of the crime." After defining "supporting evidence," the court told the jurors: "Any statement or testimony of an accomplice that tends to incriminate the defendant should be viewed with caution. You may not, however, arbitrarily disregard it. You should give that statement or testimony the weight you think it deserves after examining it with care and caution and in light of all the other evidence."

2. *Applicable Law and Standard of Review*

"'A claim of instructional error is reviewed de novo. [Citation.] An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law. [Citation.] In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed "in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the

8

instruction in an impermissible manner.""" (*People v. Lewis* (2023) 14 Cal.5th 876, 900; see *People v. Temple* (2025) 110 Cal.App.5th 1281, 1293, fn. 2.) "Instructions should be interpreted, if possible, to support the judgment, rather than defeat it, if they are reasonably susceptible to such interpretation." (*People v. Parker* (2025) 113 Cal.App.5th 1261, 1271; see *People v. Morale*s (2021) 69 Cal.App.5th 978, 994.)

### 3. *The Court Did Not Err*

To the extent McFadden did not forfeit his argument[6] and the doctrine of invited error does not apply,[7] the trial court did

---

[6] "In general, a defendant may raise for the first time on appeal instructional error affecting his or her substantial rights. [Citations.] But '[a] party may not argue on appeal that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial.'" (*People v. Buenrostro* (2018) 6 Cal.5th 367, 428; accord, *People v. Temple*, *supra*, 110 Cal.App.5th at p. 1293.) Counsel for McFadden did not object to the trial court giving CALCRIM No. 335 (in fact, he asked the court to give it), did not ask the court to define the term "accomplice," and did not ask the court to give CALCRIM No. 334, which (McFadden asserts) would have told the jury "to decide whether a witness is an accomplice" and would have given the jury the legal definition of the term "accomplice."

[7] "'The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. . . . [I]t . . . must be clear that counsel acted for tactical reasons and not out of ignorance or mistake.' In cases involving an action affirmatively taken by defense counsel, we have found a clearly implied tactical purpose

---

not err. Section 1111 provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the

---

to be sufficient to invoke the invited error rule." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49; accord, *People v. Merriman* (2014) 60 Cal.4th 1, 104.) As stated, counsel for McFadden asked the court to give CALCRIM No. 335, and he had a tactical reason for doing so: In his closing argument counsel for McFadden repeatedly attacked the credibility of Wicker, whom he described as the People's "primary witness," and reminded the jury that one of the detectives called Wicker a "'liar.'" (See *People v. Hardy* (1992) 2 Cal.4th 86, 152 [defendant was "precluded from challenging the correctness of the instruction on appeal" where his trial counsel "specifically requested the challenged instruction, presumably so he could argue the testimony of the named persons should be viewed with distrust"].)

Counsel for McFadden also had a strategic reason for not requesting CALCRIM No. 334, which would have required the defense to prove, by a preponderance of the evidence, Wicker was an accomplice. (See *People v. Rangel* (2016) 62 Cal.4th 1192, 1222 ["When a person is not an accomplice as a matter of law, a defendant has the burden of proving by a preponderance of the evidence that a witness was an accomplice in the crime charged against the defendant."].) For this reason, McFadden cannot show his counsel was ineffective for failing to request CALCRIM No. 334. (See *People v. Aguirre* (2025)18 Cal.5th 629, 679 ["Unless a defendant establishes the contrary, we shall presume that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." (Internal quotation marks omitted.)].)

10

circumstances thereof." (See *People v. Aguirre* (2025) 18 Cal.5th 629, 675.) "'Section 1111 serves to ensure that a defendant will not be convicted solely upon the testimony of an accomplice because an accomplice is likely to have self-serving motives.'" (*Aguirre*, at p. 675.) "Only when there is 'substantial evidence that a witness who has implicated the defendant was an accomplice' must the trial court instruct on 'the principles regarding accomplice testimony.'" (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1155; see *People v. Houston* (2012) 54 Cal.4th 1186, 1223; *People v. Tobias* (2001) 25 Cal.4th 327, 331.)

CALCRIM No. 335 correctly stated the law. (See *People v. Tran* (2022) 13 Cal.5th 1169, 1200 ["CALCRIM No. 335 properly instructed the jury on the corroboration requirement for inculpatory accomplice testimony or statements."].) McFadden does not contend otherwise. Rather, as discussed, McFadden argues CALCRIM No. 335 "told the jury Wicker was not the perpetrator, so the instruction imputed guilt to McFadden." CALCRIM No. 335, however, did not instruct the jury in the manner McFadden argues or impute guilt to him.

In *People v. Hardy* (1992) 2 Cal.4th 86 the Supreme Court rejected an argument similar to McFadden's. The trial court in that case instructed the jury with CALJIC No. 3.16 (which like CALCRIM No. 335 concerned the corroboration requirement for accomplice testimony) that seven witnesses who testified were accomplices "as a matter of law" and that their testimony was "subject to the rule requiring corroboration." (*Id.* at p. 151.) The defendants argued the instruction "created an irrebuttable presumption that a conspiracy existed" because, according to the defendants, the crime of murder was listed in the information, "it was obvious that the victims were murdered," "accomplices are

11

essentially identical to coconspirators," and therefore giving the instruction essentially made the seven witnesses "coconspirators," which meant "a conspiracy must have existed." (*Ibid.*) In rejecting that argument, the Supreme Court held "no reasonable juror would have so interpreted the instruction in light of the other instructions." For example, the Supreme Court stated, the trial court told the jurors that "criminal defendants 'are presumed to be innocent until the contrary is proved'" (*id.* at pp. 151-152) and that the jurors had to determine whether each defendant was a member of "'the alleged conspiracy'" and "'willfully, intentionally and knowingly joined with any other or others in the alleged conspiracy.'" (*Id.* at p. 151.)

Similarly, in *People v. Johnson* (2016) 243 Cal.App.4th 1247, the court rejected the defendants' argument CALCRIM No. 335 "amounted to an unconstitutional mandatory presumption that they aided and abetted the charged offenses—that is, that they were guilty as charged." (*Id.* at pp. 1266, 1275, 1276.) The defendants argued the jurors would have understood the statement in CALCRIM No. 335 that the defendants were accomplices "as establishing" their guilt as "aiders and abettors." (*Id.* at p. 1276.) In rejecting that argument, the court in *Johnson* explained the trial court instructed the jury on the elements of aiding and abetting, the presumption of innocence, and the prosecution's burden to prove all the elements beyond a reasonable doubt, concepts that the prosecutor and defense counsel repeated in their closing arguments. (*Ibid.*) The court concluded: "A reasonable juror would have understood CALCRIM No. 335 as directing that neither defendant could be convicted solely upon the testimony of his codefendant without independent supporting evidence, and that the testimony of each

12

defendant against the other should be viewed with 'care and caution'—not that the entire trial was without purpose because the court's instruction on how to view an accomplice's testimony was really a direction to find defendants guilty of aiding and abetting the charged offenses." (*Id.* at pp. 1276-1277; see *People v. Heishman* (1988) 45 Cal.3d 147, 163 [CALJIC No. 3.16 "could not reasonably be understood as precluding rejection of [the accomplice's] testimony—including rejection based on a conclusion that in fact she was the killer"].)

Here, as in *Hardy* and *Johnson*, it was not reasonably likely the jury ignored all the instructions the trial court gave on the presumption of innocence, the prosecution's burden of proof, the elements of the murder charge,[8] and even the language in CALCRIM No. 335 to guide the jury on how to view Wicker's testimony, and instead understood CALCRIM No. 335 as a one-step path to McFadden's guilt. (See *People v. Thomas* (2023) 14 Cal.5th 327, 382 ["'Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions.'"]; *People v. Pierce* (2025) 114 Cal.App.5th 508, 534 [same].) We presume the jury understood the purpose of CALCRIM No. 335: to guide the jury's evaluation of Wicker's testimony. (See *People v. Heishman*,

_____

[8] The trial court instructed the jury with CALCRIM No. 200, which told the jury to decide "what the facts are . . . [and] what happened, based only on the evidence that has been presented to you in this trial," and CALCRIM No. 220, which told the jury about the presumption of innocence, the People's burden to prove the charges, and the beyond-a-reasonable-doubt standard of proof. The court told the jury: "Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal, and you must find him not guilty."

*supra*, 45 Cal.3d at p. 162 [CALJIC No. 3.16 "was given to make clear that [the witness] was being labeled an accomplice for purposes of the rule requiring corroboration if her testimony were believed" and "did not literally tell the jury it could not find [the witness] was the killer"].)

Moreover, the prosecutor's argument dispelled any misunderstanding the jurors may have had about their duty. (See *People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220 ["'any theoretical possibility of confusion [may be] diminished by the parties' closing argument'"], overruled on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216; *People v. Lua* (2017) 10 Cal.App.5th 1004, 1013 [same]; *People v. Johnson*, *supra*, 243 Cal.App.4th at p. 1269 [same].) The prosecutor stated, "The first thing you are going to be deciding . . . [is], did the defendant murder Kenneth Onah?" The prosecutor explained that, "to prove a murder," he had "to prove that the defendant committed an act that caused the death of Kenneth Onah" and that, "when the defendant acted, he acted with . . . malice aforethought." The prosecutor did not discuss CALCRIM No. 335 or suggest the jury should conclude from Wicker's status as an accomplice that McFadden was the shooter. Counsel for McFadden also reminded the jurors that they were the judges of the facts, that McFadden was presumed innocent, and that the prosecution had the burden to prove "every element" of murder beyond a reasonable doubt. The closing arguments made clear the jury had to decide whether the evidence established beyond a reasonable doubt each element of the murder charge. There was

14

no reasonable likelihood the jury applied CALCRIM No. 335 as McFadden argues.[9]

The cases McFadden cites are distinguishable. For example, in *People v. Hill* (1967) 66 Cal.2d 536 the jury convicted three defendants of, among other crimes, murder and robbery. (*Id.* at p. 543.) One of the defendants testified at trial, providing details that implicated his two codefendants. (*Id.* at pp. 543, 555.) The non-testifying defendants argued on appeal the trial court erred in not instructing the jury that their testifying codefendant was an accomplice as a matter of law. (*Id.* at p. 554.) The Supreme Court held the trial court did not err, but acknowledged that the witness appeared to be an accomplice as a matter of law and that, "where a codefendant has made a judicial confession as to crimes charged, an instruction that as a matter of law such codefendant is an accomplice of other defendants might well be construed by the jurors as imputing the confessing defendant's foregone guilt to the other defendants." (*Id.* at

---

[9]    Because it was not reasonably likely the jury misapplied CALCRIM No. 335, the court, in giving the instruction, did not prejudice McFadden's defense or violate his rights under the Fifth, Sixth, or Fourteenth Amendments to the United States Constitution. (See *People v. Hardy*, *supra*, 2 Cal.4th at pp. 151-152 [accomplice-as-a-matter-of-law instruction did not violate the Fifth Amendment by stripping the defendants of the presumption of innocence or the Sixth Amendment by removing "a portion of the jury's factfinding function"].) For the same reason, McFadden cannot show his counsel was ineffective for failing to request a pinpoint instruction defining the term "accomplice" because he cannot show prejudice. (See *People v. Aguirre*, *supra*, 18 Cal.5th at p. 679 [to establish ineffective assistance of counsel, "the defendant must show that the deficient performance prejudiced the defense"].)

15

pp. 555-556.) Here, however, the People did not charge Wicker as a codefendant in Onah's murder, and Wicker did not make a confession she killed Onah that the jury could have imputed to McFadden. (See *People v. Johnson*, *supra*, 243 Cal.App.4th at p. 1269 ["[w]hen the witness is a codefendant whose testimony includes incriminating statements," the court should give CALCRIM No. 334, "Accomplice Testimony Must Be Corroborated: Dispute Whether Witness Is Accomplice, informing the jury that it must decide whether the testifying codefendant is an accomplice"].) Moreover, the Supreme Court in *Hill* explained why the trial court did not err in *not* giving the accomplice instruction; the Supreme Court did not address when or how a trial court might err in giving CALCRIM No. 335.

In *People v. Valerio* (1970) 13 Cal.App.3d 912 the defendant and his codefendant each testified, essentially blaming the other for committing the crime. (*Id.* at p. 918.) The defendant argued on appeal the trial court erred in refusing to give an instruction stating his codefendant was an accomplice as a matter of law. (*Id.* at p. 924.) The court in *Valerio* held that the case presented "a unique, but not unprecedented, situation" where, had the trial court given the instruction, the trial court would, "in effect, be instructing the jury that the codefendant was guilty of the offenses charged, thereby invading the province of the jury with respect to the determination of *her* guilt or innocence." (*Ibid.*, italics added.) The court's concern with the accomplice-as-a-matter-of-law instruction was that it would tell the jury one defendant was guilty (i.e., as an accomplice to the other defendant's crimes). Here, as discussed, the People did not charge Wicker with murder, she was not a codefendant, and her guilt was not an issue the jury had to decide.

16

B.     *The Trial Court Did Not Abuse Its Discretion in Denying McFadden's Motion To Strike the Firearm Enhancement*

McFadden argues the trial court abused its discretion in declining to strike his firearm enhancement under section 12022.53, subdivision (d).  McFadden contends that, "by focusing only on present dangerousness, the court employed the wrong standard" in applying section 1385, subdivision (c)(2).  Assuming McFadden did not forfeit this argument,[10] it lacks merit.

1.     *Relevant Proceedings*

Prior to the sentencing hearing counsel for McFadden filed a motion under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 and section 1385 to strike his five prior convictions, which were for serious or violent felonies.  McFadden stated in this motion that, when he committed the crimes, he was "youthful, immature, and under great emotional and mental stress."  The People opposed the motion, arguing that McFadden murdered Onah while he was on probation for the five felony convictions and that, while McFadden was in custody on this

_____

[10]    Counsel for McFadden did not object when the trial court found that striking the firearm enhancement would not protect the public from McFadden.  (See *People v. Scott* (1994) 9 Cal.4th 331, 353 [forfeiture applies "to claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices"]; *People v. Anderson* (2023) 88 Cal.App.5th 233, 242 [because the defendant did not object when the trial court imposed the upper term, he forfeited the argument the trial court erred "by failing to articulate the reasons for imposing the upper term and by relying on improper factors to do so"].)

17

case, he was convicted of assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(4)).

At the sentencing hearing the trial court stated it had reviewed the record and concluded McFadden "cannot be deemed to be outside the spirit of" the three strikes law. The court considered McFadden's prior felony convictions, "for which he was given a break[11] and . . . a chance to rehabilitate himself." "Instead of that," the court stated, McFadden "committed a murder." The court also stated that, while McFadden was in custody on this case, he committed an assault with means of force likely to produce great bodily injury. The court concluded: "There has been no break in his felonious conduct. And, in fact, his conduct has gotten more and more serious, and more and more violent. So I will not be exercising any discretion that I have to dismiss any of his strikes under 1385. The interests of justice would not be served by doing that."

Regarding the firearm enhancement under section 12022.53, subdivision (d), which would add 25 years to life to McFadden's sentence, the prosecutor stated that "the office policy" (under the then-district attorney) required him to ask the court to impose a sentence of 45 years to life on the murder conviction "without imposing the 25 years to life on the [section] 12022.53 allegation." The prosecutor explained it was "the office's belief that, in the interest of justice, lengthy prison sentences are not conducive or proper to reducing the crime." Counsel for McFadden did not provide any argument or evidence to prove any mitigating factors under section 1385,

---

11 The trial court stated: "What is so unbelievable about the sentencing is that he got probation on what was five individual separate counts of residential burglary. I'd enter a plea too."

18

subdivision (c)(2). The court denied the prosecutor's request: "I don't think that office policy in this particular case services the public by protecting them from this defendant. As you noted in this paper, and the fact remains, he was on probation for violent offenses when he committed this murder. So, I will not be exercising my discretion or following your office policy. I will do what I think the interest of justice demands in this case and give him the sentence that he has earned himself."

The court listed the factors in aggravation: The crime involved "great violence" and "great cruelty"; the victim "seemed to be very vulnerable"; McFadden occupied a position of leadership over Wicker, who was 18 years old at the time; and McFadden's conduct demonstrated "planning." The court found there were "no factors in mitigation at all." The court imposed a prison term of 45 years to life on the second degree murder conviction, plus 25 years to life for the firearm enhancement, for a total prison sentence of 70 years to life.

2.        *Applicable Law and Standard of Review*

Section 1385, subdivision (c), provides:

"(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute.  [¶]  (2)  In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would

19

endanger public safety. 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others."[12]  (See *People v. Walker* (2024) 16 Cal.5th 1024, 1028; *People v. Torres* (2025) 113 Cal.App.5th 88, 92; *People v. Mazur* (2023) 97 Cal.App.5th 438, 443-444; *People v. Ortiz* (2023) 87 Cal.App.5th 1087, 1094.)

"The trial court must find that *any* dismissal under [section 1385,] subdivision (c) is in 'furtherance of justice,'" a standard that "allows the court to consider factors beyond public safety in exercising its discretion whether to dismiss an enhancement, including the nature and circumstances of the crimes and the defendant's background, character, and prospects." (*People v. Mazur*, *supra*, 97 Cal.App.5th at p. 446; see § 1385, subd. (c)(1); *People v. Walker*, *supra*, 16 Cal.5th at p. 1033 ["'the ultimate question before the trial court remains whether it is in the furtherance of justice to dismiss an enhancement'"]; *People v. Ortiz*, *supra*, 87 Cal.App.5th at p. 1098 [same].)

"We review a trial court's order denying a motion to dismiss a sentence enhancement under section 1385 for abuse of discretion.  [Citations.]  A trial court may abuse its discretion where 'its decision is so irrational or arbitrary that no reasonable person could agree with it,' 'where the trial court was not "aware of its discretion"' to dismiss a sentencing allegation under section 1385, or 'where the court considered impermissible factors in declining to dismiss.'" (*Nazir v. Superior Court* (2022)

---

[12]    Section 1385, subdivision (c)(2)(A) through (I), states nine circumstances in mitigation, including that the "current offense is connected to mental illness" and that, though "a firearm was used in the current offense, it was inoperable or unloaded."

79 Cal.App.5th 478, 490; see *People v. Carmony* (2004) 33 Cal.4th 367, 373-374; *People v. Mendoza* (2023) 88 Cal.App.5th 287, 298.)

### 3. *The Court Did Not Abuse Its Discretion*

The record reflects that, in concluding that striking McFadden's firearm enhancement would not be in furtherance of justice, the trial court was aware of the standard under section 1385, subdivision (c), and considered proper factors. As discussed, after the court found the prosecutor's "office policy" would not protect the public and stated it would "not be exercising [its] discretion" to strike the firearm enhancement, the court stated it would instead sentence McFadden according to the "interest of justice." The court cited the facts that McFadden was on probation for "violent offenses" when he murdered Onah, that the crime involved "great violence" and "great cruelty," that Onah seemed "very vulnerable," and that McFadden occupied a position of leadership over Wicker, "who appeared from the evidence was possibly being pimped out" by McFadden or at least McFadden "clearly brought" Wicker to Onah's apartment. The trial court did not err in concluding that, considering the cruel and violent circumstances of the crime and the principal role McFadden played, it was not in furtherance of justice to strike the firearm enhancement. As the trial court put it, McFadden's sentence was one he "earned." (See *People v. Walker*, *supra*, 16 Cal.5th at p. 1033 [the factors in California Rules of Court, rules 4.421 (circumstances in aggravation) and 4.423 (circumstances in mitigation) are "circumstances 'long deemed essential to the "furtherance of justice" inquiry'"].)

*People v. Gonzalez* (2024) 103 Cal.App.5th 215, cited by McFadden, to the extent it was correctly decided, is

21

distinguishable. At a resentencing hearing in that case the defendant, who had been sentenced to 75 years to life, asked the superior court to strike under section 1385, subdivision (c)(2), a firearm enhancement of 25 years to life. (*Gonzalez*, at p. 222.) The trial court found the defendant would pose a danger to society "'currently at the time of sentencing,'" which the trial court clarified meant "'forward looking from today, not forward looking from 50 years from now.'" (*Id.* at pp. 223, 224.) The court in *Gonzalez* held the trial court erred in its "singular focus on whether the defendant *currently* poses a danger" because, the court in *Gonzalez* explained, "a crucial part of the inquiry" under section 1385, subdivision (c)(2), "is how the dismissal of the enhancement will impact the length of the defendant's sentence." (*Gonzalez*, at p. 228.) The court explained that a "currently dangerous defendant who will be released from prison within a short timeframe might be found by the trial court to pose a greater danger to the public than a defendant who is currently dangerous but who has no prospect of release from prison until he is elderly" and that "future review" by the Board of Parole Hearings "will act as a safety valve against a release that would endanger the public." (*Ibid.*)

The trial court here did not base its public safety assessment solely on McFadden's current dangerousness. The trial court did not use the word "current," "present," or any synonym at the sentencing hearing. Contrary to McFadden's description of "the facts of the offense" and his criminal "record" as "backward looking factors," the facts showed, as the court explained in denying McFadden's *Romero* motion, McFadden's "inability . . . to follow court orders while being on probation" and a "disregard for the law while even being in custody." Those

22

traits related to whether McFadden will pose a danger to society in the future.  Absent evidence to the contrary, we presume the trial court properly determined that, as required by section 1385, subdivision (c)(2), "dismissal of the enhancement would result in physical injury or other serious danger to others."  (See *People v. Carmony*, *supra*, 33 Cal.4th at pp. 376-377 [""[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary,"" and in ""the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review""]; *People v. Brugman* (2021) 62 Cal.App.5th 608, 638 ["In the absence of evidence to the contrary, we presume that the trial court considered all of the relevant factors and properly applied the law."].)

## DISPOSITION

The judgment is affirmed.


SEGAL, Acting P. J.

We concur:


FEUER, J.


STONE, J.

23